**KMS FUSION, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 94–593C.

United States Court of Federal Claims.

June 26, 1996.

Timothy Sullivan, Washington, DC, for plaintiff. Martin R. Fischer and Kathleen S. Nucci, Adduci, Mastriani & Schaumberg, of counsel.

Sheryl L. Floyd, Washington, DC, with whom was Assistant Attorney General Frank

W. Hunger, for defendant. Tom West, Washington, DC, and Richard S. Blakely, Oakland, CA, Department of Energy, of counsel.

### OPINION

MILLER, Judge.

This research and development contract case is before the court after trial. KMS Fusion, Inc. ("plaintiff"), seeks recovery under an alleged agreement with the Department of Energy ("DOE") to pay for close-out work following what DOE views as expiration of a modified contract. At issue are whether DOE breached the contract by failing to continue it beyond the putative expiration date and specifically the effect to be given to the preamble "whereas" clauses in conjunction with the operative language in the body of the modification.

### FACTS

On May 1, 1987, DOE, through its Nevada Operations Office, awarded Contract No. DE–AC08–87DP10560 to plaintiff. On November 11, 1988, the contract number was changed to DE–AC03–87DP10560 and transferred to DOE's San Francisco Operations Office ("DOE–SAN"). The contract required plaintiff to administer and conduct a research and development ("R & D") project in support of the Inertial Confinement Fusion ("ICF") Program and was the last in the series of contracts dating to the 1970's between DOE and plaintiff. The research involved the use and handling of tritium, a highly radioactive isotope of hydrogen regulated by the Nuclear Regulatory Commission (the "NRC"). Central to the contract was the use of a complex piece of equipment called a Chroma laser. The contract was a level-of-effort contract, whereby plaintiff was to provide 525,000 direct productive man-hours ("DPMH") and to be reimbursed on a cost-plus-fixed-fee basis. The contract had a three-year duration with two one-year options.

In January 1990 DOE decided to recompete the contract then held by plaintiff because the scope of the work required under the contract had changed. *See KMS Fusion, Inc.*, 1991–1 C.P.D. ¶ 447, at 2. Plaintiff's contract was due to expire on April 30, 1990, and the bidding on a new contract would extend substantially beyond that date. Accordingly, in order to maintain an orderly succession between the current ICF contract and the follow-on contract, whether issued to plaintiff or another contractor, DOE entered into negotiations with plaintiff to extend the contract by modification. Throughout spring 1990 face-to-face negotiations took place between plaintiff and DOE at DOE–SAN and through subsequent letters and draft agreements. The negotiations were conducted primarily by Neil W. Hennessey, plaintiff's then-Senior Vice President and Chief Financial Officer; Robert F. McCarthy, plaintiff's then-Director of Contracts; Earl Schalin, then-DOE–SAN Contracting Officer for plaintiff's contract; and Mark R. Clark, then-Contract Specialist with the Contracts Management Division, DOE–SAN.

The parties executed Modification A022 ("Mod 22") to the contract on April 30, 1990. Through Mod 22 the parties agreed to extend the base contract by increasing the limitation of funds and level of effort required. Mod 22 provided for two options to be exercised unilaterally by DOE. Option A extended performance through December 31, 1990, for a level of effort of 71,450 DPMH, at an estimated cost and fixed-fee of $7,752,-698.00. Option B extended performance to March 31, 1991, with an estimated level of effort of 9,946 DPMH, at a total estimated cost and fixed fee of $1,346,838.00. Mod 22 never mentions "close-out" nor contains a statement of work. DOE immediately exercised Option A to extend the contract through December 31, 1990.

On August 2, 1990, DOE issued a request for proposals in connection with the new contract. Plaintiff was notified on December 27, 1990, that DOE awarded the follow-on contract to General Atomics, Inc. ("GA"), and that plaintiff's R & D contract would be terminated. Following award of the follow-on contract to GA, by facsimile transmission dated December 28, 1990, from Mr. Schalin to Mr. McCarthy, DOE formally exercised Option B to Mod 22, thereby extending plaintiff's contract until March 31, 1991.

On the same day, December 28, 1990, Mr. Schalin sent Mr. McCarthy the first particularized task assignments under Mod 22. By the task assignments, DOE notified plaintiff of the specific work to be performed under the contract. Task No. 91KM01 required plaintiff to ensure that maintenance and physical security of government-furnished equipment ("GFE") was performed, along with efforts necessary to meet environmental, safety, and health requirements. DOE also directed plaintiff to ensure the maintenance of all required paperwork and prepare inventories in anticipation of close-out. By Task No. 91KM02, plaintiff was required to develop a draft plan for closing out the contract. Plaintiff was charged to

> [d]evelop a detail[ed] Facilities Close–Out Plan which describes the Contractor's schedule and activities necessary to shut down and remove all DOE ICF contract-related property from ... [your] facilities in Ann Arbor. The Plan should include (a) disposition of all classified material, (b) transfer of the on-site DOE tritium inventory to the successor contractor's facility in San Diego, CA and appropriate disposition of the tritium facility itself, (c) disassembly, preparation and crating of the on-site GFE for shipment, and (d) disposition of all other contract-related Government property in ... [your] custody.

(Emphasis omitted.) Task No. 91KM02 required delivery to DOE of a draft facilities close-out plan by January 11, 1991, and delivery of a final plan by January 18, 1991. The instructions did not require plaintiff to plan and schedule for decommissioning and decontamination ("D & D").

On January 4, 1991, plaintiff filed a protest of the award to GA with the General Accounting Office (the "GAO"). On January 10, 1991, Mr. McCarthy notified DOE of a limitation of costs and a limitation of funds, such that plaintiff had exceeded 75 percent of the funds on the contract, as of January 10, 1991, and offered DOE a current estimate to complete. Mr. McCarthy also notified DOE that

funds were sufficient to cover the contract only through January 10, 1991. Under Clause 37(b) of the contract, plaintiff was required to notify the contracting officer in writing any time plaintiff had reason to believe that the cost or funding was over or under what was required to perform on the contract.[1] Plaintiff's notice of January 10, 1991, was official notice under the contract of such limitations.

Plaintiff and DOE exchanged further correspondence as to the reasons why funds were not available to complete the contract through March 31, 1991. The main reason for the limitation of costs and funds, according to Patrick B. Long, plaintiff's Chief Executive Officer, was that Mod 22 was negotiated based on 1990 billing rates. Any work performed by plaintiff under Mod 22 ultimately occurred in 1991, by which time indirect billing rates had soared by nearly 3,000 percent. The increase in rates was due, primarily, to the loss of the underlying contract, as well as an internal reorganization of billing allocations and an inability to novate certain contracts included in the 1990 billing rates.

Plaintiff performed no direct work under the contract beginning on January 10, 1991, the date of plaintiff's notification of limitation of costs and funds, through the expiration of Mod 22 on March 31, 1991. During this period plaintiff nevertheless was required to perform a basic level of effort regardless of funding or unresolved disputes. Plaintiff's obligations to provide security at the main facility, which contained radioactive material, and basic maintenance on the nuclear equipment required plaintiff to expend funds regardless of the status of the contract. During this period DOE continued to issue instructions with respect to maintenance and security. These duties were inescapable due to the nature of the nuclear material and government proprietary information held by plaintiff. However, plaintiff did not perform any R & D, planning, or D

---

1. A contractor is not obligated to continue performance under the contract, including under the termination clause, if the costs are not contained in a cost schedule, unless the contracting officer notifies the contractor in writing that the cost has been increased and provides to the contractor the total estimated cost for performing the contract. Such an increase must be provided by form, as required under the contract.

& D. Any costs expended by plaintiff were not reimbursed, either under the contract or otherwise.

Plaintiff's bid protest was denied in part as lacking substance and dismissed in part as untimely on May 8, 1991. *KMS Fusion, Inc.*, 1991–1 C.P.D. ¶ 447, at 3. On May 16, 1991, following rejection of plaintiff's protest, DOE provided plaintiff with directions and goals on achieving certain tasks for close-out. Plaintiff responded by letter dated May 17, 1991, stating that no tasks could be performed in light of the limitation-of-costs and -funds notice which was previously provided to DOE. Plaintiff also denied DOE personnel access to plaintiff's facilities until the contract was fully funded. DOE responded on May 20, 1991, with a skeptical view of plaintiff's billing rates and its opinion that then available funds allowed continued close-out work under the contract.

In late May 1991, following denial of plaintiff's protest, plaintiff and DOE entered into substantive negotiations regarding close-out of the contract and resolution of disputes arising from Mod 22. Negotiations were held at DOE–SAN on May 23 and 24, 1991, and continued from June 4 through 6, 1991, at plaintiff's Ann Arbor offices. The later negotiations, according to Mr. Hennessey, set on-track the initial stages of an agreement that would become Modification A035 ("Mod 35"). Negotiations continued throughout June and July 1991 in person, by telephone, and through exchange of drafts of the eventual modification. A final round of negotiations was held at DOE–SAN from July 24 through 26, 1991. Subsequent drafts of the eventual agreement continued to be exchanged.

During negotiations over the July Fourth holiday weekend, a fire occurred at plaintiff's main building causing some delay in the inventory of property. An outside firm was hired to remove damaging smoke film from the equipment, further delaying inventory. The property, which had previously been labeled by ownership and proprietary status, was unaffected other than the loss of ownership labels during the cleansing process, which made the resultant close-out process concomitantly more difficult.

On August 8, 1991, plaintiff and DOE—as signed by Mr. McCarthy and Aundra Richards, then-Contracting Officer at DOE–SAN responsible for plaintiff's contract—agreed to Mod 35. Mod 35 contained the following introductory clauses:

WHEREAS, the parties have agreed to terms effective from January 1, 1991 which will allow KMS Fusion to be reimbursed for direct and indirect costs incurred, and will remove all impediments to the cooperative efforts of the parties to close out the subject contract; and

WHEREAS, subject to the availability of funds, DOE intends to incrementally fund the contract as needed, up to the total estimated cost; and

WHEREAS, subject to the availability of funds, DOE intends to adjust the estimated cost of the contract as necessary to support additional close-out effort required of KMS; and

WHEREAS, the contract period of performance for contract close-out, as extended by this modification, will be further extended beyond December 31, 1991 to the extent it is necessary to incur costs under the contract after that date. . . .

Mod 35 also contained paragraph 4, which stated:

Clause F.4, *TERM OF CONTRACT*, is amended, exclusively for the purposes of closing out the contract, from the existing expiration date of March 31, 1991 to a new expiration date of December 31, 1991.

Under paragraph 1 of Mod 35, modifying Clause B.4 of the contract, the total estimated cost and fixed fee was increased to $65,-580,229.00, and under paragraph 2, modifying Clause B.9, the limitation of funds was increased by $2 million, to a total of $62,692,-179.00 in order to cover plaintiff's work effort through September 30, 1991. Mod 35 renewed Option B of Mod 22, calling "for 9,946 DPMH of close-out effort." By Mod 35 plaintiff agreed to "immediately resume full cooperative direct and indirect effort with DOE to close out the subject contract."

Mod 35 also provided for payments to plaintiff for unoccupied space at plaintiff's facilities, so-called "building and support

costs." The purpose of allowing such costs, after contract work was complete, was to limit plaintiff's exposure to vacant facilities costs. Plaintiff's lease ran through August 1994. Since plaintiff's R & D effort involved radioactive isotopes and related contamination, a sublease of the buildings after December 31, 1991, inevitably would engender some difficulties. Accordingly, paragraph 5 of Mod 35 modified Clause H.35.C and provided that "the cost of idle facilities are [sic] allowable indirect charges." DOE would reimburse plaintiff for "the cost of idle facilities for a period of twelve months after the facilities are idle." Mod 35 defines the terms and conditions upon which the maximum 12–month period began to run.

Plaintiff's facilities were divided into two separate wings, which had different contractual requirements as to the duration of allowable costs. The East Wing, composed of approximately 71,668 square feet and used for administrative efforts and other company activities, was to be declared idle when the building was vacated, with the exception of the Radiation Safety Analysis Laboratory, which was to be declared idle at a later date. The West Wing, approximately 55,693 square feet and used primarily for ICF research, was to be declared idle "[w]hen the last restriction under the NRC license on use of the West Wing is removed and the West Wing is vacated. . . ."

Total close-out of the contract involved a number of distinct tasks, with the overall goal of vacated warehouse sites and the completion of D & D. Included were the separation and shipment of particular government property to other laboratories and the disposal of equipment of lesser value. Plaintiff's warehouse also contained thousands of chemicals and attendant disposal of hazardous chemical waste and mixed waste. Close-out required the D & D of plaintiff's facilities. At a minimum D & D involved the removal of all bulk nuclear waste and the cleansing of the building. Mod 35 contemplated that plaintiff was to ship all bulk tritium to the National Test Site ("NTS") in Nevada. That process alone, according to Dr. John C. Widman, Jr., plaintiff's then-Safety Director, would take at least six months for the requi-

site approval, or potentially longer due to delays in the processing of applications. The parties dispute the level to which plaintiff was required to cleanse. However, plaintiff was required, at a minimum, to meet the standards of its license issued by the NRC for removal of radioactive contamination. Plaintiff maintains that the goal of D & D was removal of radioactive contamination down to the lowest reasonable rate ("ALARA"—as low as reasonably achievable), a flexible rate dependent on individual circumstances and costs. Plaintiff's East Wing facilities was contaminated in places with only trace levels of radiation. The West Wing, where the bulk of nuclear testing occurred, was contaminated more heavily.

The cover letter accompanying Mod 35, dated August 8, 1991, from Contracting Officer Richards, included technical directions relating to "initial close-out activities." The cover letter directed plaintiff to submit a "substantially complete" close-out plan within five days, albeit acknowledging "that it may require revision as it is being implemented." DOE issued its first set of close-out tasks on August 13, 1991, by a facsimile transmission from Sarah S. Eary, Contracting Officer, DOE–SAN, to Mr. McCarthy, revising Task Nos. 91KM01 through 91KM03. Task No. 91KM02 was revised to require a detailed facilities close-out plan by September 30, 1991, and contained "[a]dditional [c]omments:"

> After submittal of the draft Facilities Close–Out Plan (due 08/16/91) KMS should coordinate closely with ... [DOE's contract representative and other technical representatives] to appropriately revise and finalize the draft Plan. Specific facilities close-out activities will be authorized, by additional Task Assignments, as quickly as possible based on DOE's discussions with KMS and consideration of the Facilities Close–Out Plan.

Plaintiff submitted its first draft close-out plan on August 15, 1991. The plan's statement of work included: 1) the disposition of all classified material; 2) the transfer of the on-site DOE tritium inventory to the successor contractor; 3) the disassembly, preparation, and crating of the on-site GFE for

shipment; and 4) the disposition of all other contract-related government property in plaintiff's custody. The draft plan estimated 13,594.66 DPMH to complete close-out.

Plaintiff submitted a second close-out plan to DOE on August 23, 1991 (the "revised plan"). The revised plan contained a similar statement of work. While anticipating potentially "significant task changes, additions and scheduling changes ... [and] revision," plaintiff noted that the revised plan contained "reasonable assumptions of appropriate guidelines for the close-out...." The revised plan estimated 22,231 DPMH to complete close-out. According to Mr. Long, the second plan was necessary, as the first plan omitted information and contained items that required revision; moreover, DOE had made certain requests for information in the interim.

From August 26 through August 30, 1991, John Helminski, Property Manager, DOE–SAN, visited plaintiff's facilities to assist and assess property-related close-out effort and plans. Personnel from Battelle Environmental Management Operations, a DOE subcontractor for environmental cleanup, traveled to plaintiff's facilities on September 3 and 4, 1991, to assess the progress of close-out. Included among their observations in a letter dated September 18, 1991, was the assessment that plaintiff did "not appear to have qualified staff to plan and conduct D & D of the facility."

On September 9, 1991, Contracting Officer Richards notified Mr. McCarthy of DOE's concerns with plaintiff's close-out plans. DOE disputed both the manner in which plaintiff submitted the plans and their content. Ms. Richards also stated that the purpose of the facilities close-out plan called for under Task No. 91KM02 "was to identify all the requirements and activities necessary for closeout." As plaintiff's revised plan, according to Ms. Richards, was not authorized or expected under Task No. 91KM02, plaintiff was advised that "DOE will use the ... [revised plan] as a reference, but will not direct or authorize that it be further revised in order to produce a final stand alone document."

As close-out work continued during the fall of 1991, Ms. Richards asked Mr. McCarthy for an estimate of close-out work to be completed beyond the expiration of Mod 35. On September 27, 1991, Ms. Richards wrote:

While some close-out activities have begun, it is apparent that significant effort will remain to be accomplished after the end of the year. It is now the end of September, with only three months remaining in the present contract period. If we are to negotiate an extension with an associated estimated level of effort before the contract expires, we must begin now.

KMS is therefore requested to immediately begin preparation of a proposal for the balance of the close-out effort and costs beyond December 31, 1991....

On October 1, 1991, plaintiff notified DOE, as required under the contract, that it expected within the next 60 days to exceed 75 percent of the estimated cost and total amount allotted to the contract. Plaintiff estimated total cost for close-out at $74,156,-692.00. On the same day, plaintiff also responded to Ms. Richard's September 27 letter stating that, based on a lack of guidance for close-out under the contract, preparation of a proposal for post-Mod 35 work was difficult. On October 4, 1991, Ms. Richards made another formal request for a contract proposal for close-out work beyond December 31, 1991.

On October 25, 1991, plaintiff submitted its proposal for close-out work beyond December 31, 1991. The plan covered work to be performed from the first quarter of 1992 through the first quarter of 1994. The proposal requested an additional $14,556,161.00 to complete close-out and 31,408 DPMH, for a total estimated labor effort of 41,348 DPMH, inclusive of the 9,946 DPMH authorized by Mod 35.

Substantive close-out work continued through the fall of 1991. Harvey J. Miskerik, plaintiff's then-Materials Property Manager and Government Property Officer, was involved in generating computer printouts on types of property and equipment, obtaining moving estimates, working with DOE–SAN about relocating some equipment for GA, and relocating other pieces to University of Mich-

igan and Los Alamos National Laboratories. Other close-out activities included the shutting down and return of computer equipment and disposing of hazardous chemicals. Four moving vans of equipment were shipped to the GA warehouse in Ann Arbor during approximately the first two weeks of December 1991. At about the same time, nine moving vans were sent to the University of Michigan. Plaintiff also later shipped four moving vans of materials to Los Alamos National Laboratories in the last week of March 1992. The majority of shipments were paid for by the recipient of the materials.

DOE officials met with officials from the NRC on October 29, 1991, to discuss the actions that plaintiff needed to undertake in order to terminate its materials license. As part of the process, plaintiff was required to provide a site characterization plan, a remediation plan based on the site characterization plan, and a close-out survey. In sum total the process would take at least six months, inescapably extending past the December 31, 1991 conclusion of the contract, according to Donald M. Wilhelm, the Contracting Officer's Technical Representative, DOE–SAN, for plaintiff's contract following Mod 35.

Through Mod 38, executed on November 4, 1991, in response to plaintiff's requests for additional financing, DOE increased the estimated cost and fixed fee for the contract by $500,000.00. On November 14, 1991, plaintiff again notified DOE of an impending limitation of costs and limitation of funds, requested an increase in funding for the contract, and stated its intention to perform minimal work absent an increase. Contracting Officer Richards responded on November 18, 1991, denying plaintiff's request, and directing plaintiff to continue performance as required under the contract. On November 19, 1996, Ms. Richards also provided plaintiff with a task assignment form for the disposition of GFE in the West Wing.

Officials from DOE–SAN, including Wayne E. Keheley, then-Assistant Manager for Defense Programs; Kathleen M. Day, then-Director, Contracts Division; and Tommy D. Chang, then-Director, Atomic Vapor Laser Isotope Separation Program Division, traveled to plaintiff's facilities on November 21, 1991, to discuss certain close-out activities and to inform plaintiff of DOE's intention not to extend the contract period of performance beyond December 31, 1991. By letter dated November 27, 1991, Terry A. Vaeth, then-Acting Manager, DOE–SAN, confirmed to plaintiff that, pursuant to the meeting at plaintiff's facilities, DOE would not be extending the contract beyond December 31, 1991. By that letter DOE also presented to plaintiff dates by which tasks were to be completed. Primary among the deadlines was a mandate that all property be removed from both the East and West Wings by December 20, 1991.

On December 5, 1991, plaintiff's Mr. Long informed DOE by letter that plaintiff viewed DOE's decision not to extend the contract as a breach of Mod 35. Mr. Long followed that letter with a similar claim on December 12, 1991, stating that DOE's breach was compounded by DOE's failure to add funds to the contract.

As close-out work continued, Ms. Day notified plaintiff on December 17, 1991, that DOE was declaring the East Wing idle, with the exception of the Radiation Safety Analysis Laboratory, for purposes of reimbursement under the contract. At that point the building contained, according to DOE, a few rooms of government-owned computer equipment and some file cabinets. Two days later on December 19, 1991, Ms. Day notified Mr. Long of DOE's view that the best course of action for completing close-out would be to allow DOE directly to control the removal of the remaining property and D & D in the West Wing.

In an effort to facilitate close-out, DOE made an offer to plaintiff to exchange certain equipment. Mr. Long responded on December 27, 1991, with a seven-item proposal for exchange of equipment and responsibilities. DOE did not reply to plaintiff's proposal until January 3, 1992, stating that the offer was unacceptable as lacking cost information and the rationale for each element.

With close-out incomplete, and under DOE's view that the contract was due to expire on December 31, 1991, Mr. Chang, at the direction of DOE management, arrived at

plaintiff's facilities in Ann Arbor on December 31, 1991. Mr. Chang was directed to retrieve all keys to the facilities and to telephone DOE management in Washington, DC; thereafter, a safety team would be dispatched to continue security at the facilities. According to Mr. Chang, DOE had no written safety or close-out plan as of December 31, 1991, but certain staff were available immediately to implement safety measures. As of the date of his trip, Mr. Chang was aware that close-out efforts were incomplete. Mr. Hennessey met Mr. Chang in the lobby of plaintiff's facilities, and, following a brief conversation, Mr. Chang left the grounds without the keys. Mr. Hennessey asserted that DOE had neither a right of access nor a right to take control of the building.

In light of the continued dispute over close-out, DOE invited plaintiff to attend a scheduled meeting with DOE and the Department of Justice at the Office of the United States Attorney in Detroit, in order to discuss the removal of government-owned property from the facilities in Ann Arbor. Plaintiff did not attend the meeting held on February 13, 1992.

On February 25, 1992, Ms. Day executed a document entitled "Obligation Memorandum." The Obligation Memorandum states: "In view of the Government Owned Property still remaining on-site at the KMS facility, and pursuant to understandings reached in Modification A035 ... this document shall provide the legal mechanism by which KMS Fusion, Inc., will receive financial reimbursement for building support costs incurred subsequent to contract expiration on December 31, 1991." The Obligation Memorandum was forwarded to plaintiff on February 26, 1992, with a cover letter from Ms. Day. Plaintiff did not sign the Obligation Memorandum and continued to submit invoices to DOE after December 31, 1991, as if the contract remained in effect, consistent with plaintiff's view.

Following expiration of the contract on December 31, 1991, minimal close-out activity occurred. In January 1992 the NRC requested that plaintiff develop a site characterization plan, which plaintiff developed and DOE approved. Certain maintenance and security activities also continued. However, most activity within plaintiff's organization slowly halted. Plaintiff began to develop plans to sell off other businesses and assets, cut payroll, and discharge any nonessential employees. It was plaintiff's position that, regardless of the status of the contract, plaintiff still bore maintenance and security responsibilities under the contract as extended, including performing D & D with respect to the tritium remaining in its facilities. All of plaintiff's cognizant witnesses were insistent that plaintiff, per the terms of its NRC license, simply could not abandon the tritium and DOE classified material in place.

On February 14, 1992, DOE requested an additional proposal from plaintiff for completion of close-out. DOE thereafter notified plaintiff by letter dated March 11, 1992, that it viewed plaintiff's February 24, 1992 proposal as inadequate. Lacking an acceptable plan, DOE sued plaintiff in a claim and delivery action in the United States District Court for the Eastern District of Michigan to regain possession of GFE located at plaintiff's facilities. *United States v. KMS Fusion, Inc.*, No. 92–CV–71423–DT (E.D.Mich., filed Mar. 16, 1992). During pendency of DOE's replevin suit, plaintiff performed minimal work, primarily with respect to tritium-related maintenance and security.

On July 26, 1993, the district court dismissed DOE's complaint and granted plaintiff's second summary judgment motion. On November 10, 1993, the parties entered into a partial settlement agreement and filed a Joint Motion To Vacate Order and Judgment of August 12, 1993 and To Dismiss Case with Prejudice, which the court accepted. The partial settlement agreement enabled a payment to plaintiff of $2 million and transferred to DOE, effective January 14, 1994, full control over plaintiff's facilities, responsibility for the transfer of property, and responsibility for D & D. The partial settlement agreement excluded from its scope any claims relating to the contract. However, the agreement provided for a $2 million offset and credit against any future judgment in favor of plaintiff.

Per the partial settlement agreement, control over plaintiff's facilities in Ann Arbor

was transferred to DOE in January 1994, to conclude close-out activities. Michael J. Cornell, Health Physicist, DOE–SAN, was appointed as project manager. DOE was responsible for removing the remaining materials and hazardous waste on site and conducting D & D of the facilities. Because DOE is not subject to NRC licensing regulations, DOE did not assume plaintiff's NRC license at the time of takeover of the facilities. In April 1994 DOE replaced Battelle (then) Northwest Laboratories with Lawrence Livermore National Laboratory due to performance problems and a better working relationship with Lawrence Livermore.

DOE submitted to the NRC its final report of independent verification in June 1995, as required by DOE and NRC. On June 23, 1995, DOE received a letter from Edward M. Ballard, Michigan Department of Public Health, concurring with the outcome of DOE's D & D at plaintiff's facilities, thereby effectively completing close-out. Including property removal, D & D, required paperwork and reports, DOE completed close-out within approximately 18 months. Other than paperwork DOE completed close-out in January of 1995. Total cost of close-out was $3,932,000.00, and total labor effort was 31,-368 DPMH.

Pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601–13 (1994), plaintiff submitted several certified claims to DOE during the dispute, including a June 10, 1994 certified claim in the amount of $15,374,539.00 for damages for breach of contract. That claim was denied on August 23, 1994. The Defense Contracting Audit Agency (the "DCAA") conducted several audits of plaintiff's claims, including audits dated May 26, 1993, for FY92 costs; July 19, 1995, for FY93 costs; August 30, 1995; and September 4, 1995. DCAA also issued a supplemental audit on October 27, 1995.

Plaintiff filed suit on September 9, 1994, alleging that, by the terms of Mod 35, performance was to continue under the contract after the stated expiration date of December 31, 1991, and sought $15,374,539.00, plus interest. Plaintiff moved for summary judgment as to DOE's liability for breach of contract based on the plain language of Mod 35. Defendant cross-moved for summary judgment complete or, in the alternative, on plaintiff's claims for lost investments due to DOE's alleged breach of contract. In an unpublished opinion, the court denied the cross-motions for summary judgment on the basis of the contract language due to ambiguities preventing ascertainment of the parties' intent. *KMS Fusion, Inc. v. United States*, No. 94–593C, slip op. at 11–14 (Fed.Cl. Aug. 31, 1995) (unpubl.). Defendant's cross-motion regarding claims for lost investments was granted. *Id.* at 14–15. Plaintiff amended its complaint on February 9, 1996, seeking $9,388,256.00, plus interest, reflecting additional claims for costs and expenses incurred in 1994 and deducting claims rejected on summary judgment. Trial followed.

## DISCUSSION

It is ambiguity, which only occurs when a contract is susceptible to two reasonable interpretations, *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed.Cir.1986), that brings this case to court. The core of the parties' dispute devolves to their intentions when negotiating a modification to their contract. In addressing the earlier cross-motions for summary judgment, the court set forth the case law governing the interpretation of their contractual arrangement. *KMS Fusion, Inc. v. United States*, No. 94–593C, slip op. at 10–11 (Fed. Cl. Aug. 31, 1995) (unpubl.). Guiding the court's fact finding and legal conclusions are the precepts discussed below.

When resolving a question of contract interpretation, the court's primary purpose is to ascertain the intention of the contracting parties, *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1185 (Fed.Cir.1988) (citing *S. Williston, A Treatise on the Law of Contracts* § 601 (3d ed. 1961)), as the parties' intention controls a contract's interpretation. *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971). An interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless, *Fortec Constrs. v. United States*, 760 F.2d 1288, 1292 (Fed. Cir.1985), and an agreement should be read

as a whole so as to avoid conflicts between provisions within the contract. *Reliance Ins. Co. v. United States,* 931 F.2d 863, 865 (Fed. Cir.1991); *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965).

■ The court must give meaning and effect to the intentions of the parties as expressed in the language of the contract. *Aleman Food Servs., Inc. v. United States,* 994 F.2d 819, 822 (Fed.Cir.1993) (citing *Gould, Inc. v. United States,* 935 F.2d 1271, 1272 (Fed.Cir.1991)). An effort to determine the parties' intent in this case solely on the plain meaning of the contractual language, which is the court's first priority, *Aleman,* 994 F.2d at 822, proved futile on summary judgment.

■ The language of this contract is vague and ambiguous. In this situation, factors outside of the contractual terms can be taken into account. *David Nassif Assocs. v. United States,* 214 Ct.Cl. 407, 419–20, 557 F.2d 249, 256 (1977); *Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972). The court can look at all the relevant circumstances surrounding the transaction to discover the parties' underlying intention, *Julius Goldman's Egg City v. United States,* 697 F.2d 1051, 1058 (Fed.Cir.), *cert. denied,* 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983), including the conduct of the parties before the advent of the controversy, oral statements, writings, the recitals to a contract, prior negotiations, and other conduct by which the parties manifested their assent. *See, e.g., Teamsters Indus. Employees Welfare Fund v. Rolls–Royce Motor Cars, Inc.* 989 F.2d 132, 135 (3d Cir.1993). Although "whereas" clauses generally are not considered "contractual" and cannot be permitted to control the express provisions of the contract, recitals may be read in conjunction with the operative portions of a contract in order to ascertain the intention of the parties. *See Gulf Oil Corp. v. Federal Power Comm'n,* 563 F.2d 588, 598 (3d Cir.1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978); *Fidelity Bank v. Lutheran Mut. Life Ins. Co.,* 465 F.2d 211, 214 (10th Cir.1972); *Kogod v. Stanley Co. of Am.,* 186 F.2d 763, 765 (D.C.Cir.

1950); *see also Stech v. Panel Mart, Inc.,* 434 N.E.2d 97, 100 (Ind.App.1982).

■ Contract interpretation constitutes an objective test, and the standard is what a similarly situated, reasonably prudent contractor would have understood the contract language to mean, not what the drafter or any other party subjectively intended the contract to mean. *City of Oxnard v. United States,* 851 F.2d 344, 347 (Fed.Cir.1988). As noted, the "principal objective in deciding what contractual language means is to discern the parties' intent at the time the contract was signed." *Winstar Corp. v. United States,* 64 F.3d 1531, 1540 (Fed.Cir.1995), *cert. granted,* — U.S. —, 116 S.Ct. 806, 133 L.Ed.2d 753 (1996) (*argued* Apr. 24, 1996).

Trial revealed that the intense reliance placed by plaintiff on one "whereas" clause and by defendant on an apparently conflicting operative provision was beside the point. The parties themselves always intended the provisions to be read together. Trial also revealed that the tools enabling purely legal interpretation of contractual provisions would reach an arbitrary result: Plaintiff would have the extension date of the contract depend on when plaintiff completed close-out irrespective of the need for bilateral contractual extensions; defendant would ignore the parties' shared understanding that close-out would not be completed in its entirety as of December 31, 1991. Perhaps the only point of accord is that the written instrument failed to carry forward either plaintiff's or DOE's express intentions.

### 1. *Drafting of Mod 35*

■ Mod 35, as signed by the parties on August 8, 1991, contained four whereas clauses, the last of which was one of the primary foci of trial and the previous effort on summary judgment. The whereas clauses, specifically the fourth clause purporting to extend the contract beyond December 31, 1991, were the subject of extensive negotiations as independent elements and were only included as whereas clauses late in the negotiations by DOE as a formatting convenience.

The inclusion of language purportedly requiring an extension of the contract beyond any stated expiration date was not only the subject of extensive negotiations, but a key provision, from plaintiff's point of view. The first draft agreement that plaintiff received from DOE on June 21, 1991, after face-to-face discussions at plaintiff's facilities in late June 1991, included paragraph 3.C, which stated:

Contract period of performance will be extended, exclusively for the purpose of contract close-out, from the existing expiration date of March 31, 1991, to a new expiration date of December 31, 1991. The contract period of performance for contract close-out will be further extended beyond December 31, 1991, if contract close-out efforts are required beyond that date.

According to Mr. Hennessey, this language, which closely resembles the language ultimately included in the fourth whereas clause, was unacceptable because it allowed DOE to determine unilaterally if additional work was necessary.

By June 25 or 26, 1991, the parties began to include in draft versions the language that would become the fourth whereas clause of Mod 35. In a draft sent by DOE to Mr. McCarthy on June 25 or 26, 1991 (the date is barely legible), and in a marked-up draft sent by Mr. Hennessey to DOE on June 26, 1991, the second sentence of paragraph 3.C was modified to state that "[t]he contract period of performance for contract close-out will be further extended beyond December 31, 1991, to the extent it is necessary to incur costs under the contract after that date." According to Mr. Hennessey, the language "necessary to incur costs" was intended to identify "the mechanism under which we could proceed on reaching an agreement with a document that was going to have an arbitrary expiration date of December 31, 1991 and have assurances that in fact the vehicle was there to assure that it would be further extended once we understood how long it was in fact going to take." Subsequent drafts of the contract exchanged between DOE and plaintiff retained similar language, including drafts sent on July 5, 11, 18, 22, and 23, 1991.

The draft version that DOE sent to Mr. McCarthy on August 2, 1991, was unique in that it was the first version structured with whereas clauses, similar to Mod 35 as signed by the parties. DOE transformed the second sentence of paragraph 3.C into the fourth whereas clause, which reads: "WHEREAS, the contract period of performance for contract close-out, as extended by this modification, will be further extended beyond December 31, 1991 to the extent it is necessary to incur costs under the contract after that date...." Paragraph 3.C from the previous drafts also included a termination date of December 31, 1991, which was included in the August 2, 1991 draft as paragraph 4. In this manner both sentences of the former paragraph 3.C were included in the draft.

In Mod 35, signed some six days later on August 8, 1991, the former paragraph 3.C similarly was split between the fourth whereas clause and a paragraph containing term. The bifurcation of the paragraph, which contained important concepts for both parties, had an effect that can be described as both important and irrelevant. According to the traditional rules of contract interpretation regarding whereas clauses, the placement of the second sentence into a whereas clause would render that language subjugated to the other substantive terms of the contract, a rather important effect. However, even a casual reading of the original paragraph indicates that, had paragraph 3.C appeared whole in the final modification, the terms of the contract concerning extension following expiration would require additional interpretation and explanation.

The bifurcation of the two sentences ultimately did not have any practical effect on the modification. Mr. Hennessey testified that he viewed the bifurcation as merely a matter of necessity dictated by required structures for a modification of a government contract:

THE COURT: ... [B]efore [Mod 35,] the concepts of the term of the contract and the extension were in one paragraph, which has been basically paragraph three in all these iterations.

Now we have the concept split between the whereas clause and the body of the contract language. Did the fact that it was split have any significance to you?

[MR. HENNESSEY]: That was a way to implement what was the intention of the negotiations up to this point in time.

THE COURT: But in your view, was there any particular change that had been effected by splitting them?

[MR. HENNESSEY]: Any change in the concept?

THE COURT: Right.

[MR. HENNESSEY]: None at all. It was a manner to implement the concept [a]s the way it appeared to us at the time and the way it still appears ... now when I read it.

THE COURT: I gather you did not prepare the specific draft. DOE typed this specific draft?

[MR. HENNESSEY]: That's correct. In fact, ... we did not know it was coming into this format until we received it in this format. Prior discussions had not taken place with KMS that ... they were putting [it] into this format.

THE COURT: So in your view the changed format did not change your understanding of the prior, what we will call paragraph three?

[MR. HENNESSEY]: Correct.

Mr. Clark, the former Contract Specialist with the Contracts Management Division, DOE–SAN, proffered that paragraph 3.C was divided for the following reasons:

Q Do you recall how this passage, what was the second sentence of Paragraph 3(C), became part of the Whereas portion of this document? Do you recall how that evolved?

A ... [I]t was identified at some point when we identified the need to create a modification, as opposed to the letter.

The letter had been the vehicle for documenting the position where we were as we moved along in the negotiations, and then at some point I think in early August probably we identified that we were close to an agreement that we could sign. We identified the need to establish a modification.

We looked at the letter, and we said some of this is modification stuff, and some of it is not, but it still needs to be communicated to the contractor. Some of it we'll put in the mod. Some of it we'll put in the letter.

There is some of it that isn't a modification to the contract, but the contractor places high value on it and wants it to be given prominent position.... [O]f course, this first thing, the first Whereas, we both wanted to give high visibility to.

If you look at all of the Whereas clauses together, the one where it says this will remove all impediments to cooperative efforts is also very important to us because there had been many impediments to cooperative efforts, and we wanted that to stop. We put the fourth Whereas in there.

This was all worked out between the parties. This wasn't a unilateral action.

As to why particular language was included in a whereas clause, rather than in the body of Mod 35, Mr. Clark stated:

THE COURT: And I am inferring the language that was put in the Whereas clause you would typically not find in the modification text.

[MR. CLARK]: Right, because it wasn't actually modifying something in the contract, whereas the language in the modification itself after the "Now, therefore ..." is a specific literal delete and insert in lieu thereof sort of thing where you are actually changing the contract.

The stuff before that is informational, and it may represent to whatever extent an understanding or an agreement or intention or whatever, but it is not an actual modification of the contract.

THE COURT: In other words, you were taking the parties' understanding as developed through these letters, the last one specifically because the language is the same, and you were putting it in the form of a modification?

[MR. CLARK]: Right.

It is the statement in the fourth whereas clause that the contract "will be further ex-

tended beyond December 31, 1991 to the extent it is necessary" that is the primary reason this case is before the court. Plaintiff placed an intense reliance on the language, which was characterized by Mr. Hennessey as "the whole foundation under which this modification to the contract had been agreed to." The fact that the language was in a whereas clause, rather than the body of the contract, was of little concern to plaintiff. According to Mr. Hennessey:

[I]t appeared to us that it was placing the importance on this set of conditions so that everybody understood that it was based upon this set of understandings that we were in fact able to then make the modifications to the contract that ... were being made by this Mod. 35.

Unfortunately, the movement of the term, so material to plaintiff, had the opposite effect of highlighting its importance. Movement out of the body of Mod 35 into the ceremonial introductory clauses rendered the clause nearly moot. But for other inherent ambiguities in the operative provisions of Mod 35, this case might have been resolved on the plain language of the contract. However, the contradiction between paragraph 5(C), which obligates DOE to make continued payments for idle facilities, and paragraph 4's expiration date of December 31, 1991, required the case to move beyond summary judgment into trial. *See KMS Fusion, Inc. v. United States,* No. 94–593C, slip op. at 12–13 (Fed.Cl. Aug. 31, 1995) (unpubl.).

Nevertheless, inartful drafting of the contract remains the primary reason for this dispute, for Mod 35 fails to convey effectively or implement the parties' intentions. The division of language that ultimately produced the whereas clauses created a drafting ambiguity that both plaintiff and DOE were remiss to approve. A basic rule of contract drafting holds that "[n]o experienced drafter will make the mistake of using such clauses to bear the burden of substantive provisions of the agreement, for courts regard recitals as subordinate to the operative part of the contract." *E. Allan Farnsworth, Farnsworth on Contracts,* vol. 2, § 7.10a, p. 260 (1990) (citations omitted).

The evidence introduced at trial is sufficiently convincing that plaintiff placed an intense reliance on the fourth whereas clause and that DOE was aware of its importance to plaintiff. Consequently, the division in Mod 35 of the former paragraph 3.C into the fourth whereas clause and the expiration term of the contract had little effect on the meaning or importance of the language. The terms of the fourth whereas clause—indeed, all of the four whereas clauses—remained substantive and an integral part of the contract. They will be accorded weight as such.

Nevertheless, hindsight teaches us that the language in Mod 35 was imprecise and difficult to construe, even with the most obvious evidence of the parties' intentions. Mod 35 certainly did not accomplish what either party intended it to do. It is not language to which the usual rules of contract interpretation can easily be applied. Rather, the court must read Mod 35 in the context of the parties' past dealings and what the witnesses have described as their intentions at the time of execution. The court, therefore, will examine the context in which DOE made the decision not to extend the contract beyond December 31, 1991.

### 2. *Intentions at the time of Mod 35*

By Mod 35 the parties intended, at the very least, to accomplish the beginning of close-out. That assertion is undisputed, as evidenced by the first whereas clause requiring "the cooperative efforts of the parties to close-out the subject contract." Plaintiff argues that Mod 35 was an agreement only for the limited activities of initial close-out, while defendant maintains that the bulk of close-out work should have been accomplished before December 31, 1991. As a related issue, the parties also dispute the amount of labor necessary to complete close-out and the extent to which close-out was to be accomplished within Mod 35's 9,946 DPMH.

### 1) *Expiration date of Mod 35*

Mod 35, per paragraph 4, extended the term of the contract until December 31, 1991, "exclusively for the purposes of closing out the contract." The parties dispute whether all close-out work was to be completed by that date. One of the unanswered questions

addressed at trial is why, given that plaintiff did not expect close-out to be completed by December 31, 1991, and that it did not fully comprehend the amount of effort required, plaintiff nevertheless agreed to the expiration date.

Plaintiff's evidence, including the testimony of Mr. Hennessey, would show that because of these unknowns, plaintiff negotiated a mandatory extension of the contract. Since the expiration date remained a part of the extended contract, consistent with the parties' course of dealings on their principal contract and prior modification, that explanation is not persuasive, and the significance to plaintiff of the expiration date remains unanswered. However, Mr. Hennessey did testify to the following:

Q  Did the expiration date set forth in paragraph four, which could be clause F.4 term of contract, did that expiration date concern KMS?

A  No.

Q  Why not?

A  Because in order to mod[ify] the contract, there had to be some term included in the contract and December 31 was as good a date as any and we felt that December 31 would give everybody the time that was necessary to complete the closeout plan to reach agreement with DOE of what really needed to be accomplished during closeout.

The whereas clauses provided the vehicle in which once we knew and had the ability to develop an estimate of what it was going to cost us to complete and how long it was going to take, then the vehicle was there to enable the contract to be further extended.

On the other hand, Mr. Neely testified that DOE considered the expiration date important and representative of the expected completion of closeout:

My expectation and understanding with regard to the contract expiration date was we felt that the period of time to the end of the year was more than reasonable to get the equipment out. We felt that the period of time to the end of the year was more than reasonable ... to do the clean up activities, and that probably the one item that could be a stumbling block would be the approval to get to the Nevada Test Site [for disposal].

However, additional evidence introduced by plaintiff counters DOE's explanation and illustrates that DOE did not expect complete close-out by December 31, 1991. As to DOE's expectation of how long close-out work would last, Mr. Clark testified:

[THE COURT]: Do I understand that you, as one of the negotiators, contemplated that the contract work would extend beyond December 31, 1991?

[MR. CLARK]: ... [T]he advice we received from technical personnel was that it didn't necessarily have to extend beyond December 31, 1991, but it might well.

With assiduous effort and cooperation of the parties, it could have been done. However, there was a possibility and maybe a likelihood that it would extend beyond December 31, 1991, and that there were portions of it that would probably take longer, the portions having to do with the radioactive material.

However, even with that I don't think we had a definitive reading on how long it would take.

THE COURT: You said that there was a likelihood that it would extend beyond December 31, although with assiduous effort and cooperation it could have been completed before that date. Then you said there were definitely portions that would take longer.

Are you saying that even with assiduous effort and cooperation, there were certain portions that would have taken longer in any event, meaning the D & D?

[MR. CLARK]: Yes. I'm not an expert in that area, and I made that very clear to KMS. There were areas, but then there was the question of who would do it, whether it would be KMS effort under this contract or whether it would be done by somebody else. That had not been resolved either.

THE COURT: In my mind, what you are doing is making a distinction. There were tasks other than D & D that with

assiduous effort and cooperation could be accomplished by December 31, but the D & D component would take longer. Is that a fair statement of your understanding?

[MR. CLARK]: That would be the part that would be most likely to take longer. Again, it depended to a very great extent upon the cooperation of the parties. That's why the first Whereas was so important.

Similarly, an internal DOE memorandum, dated October 11, 1991, states that "[i]t was fully recognized at the time of this contract action that KMS'[ ] close-out activities and costs would extend beyond 1991 and would require further negotiations for the remainder of the close-out activities."

Regarding DOE's expectations, although Mr. Neely testified that DOE was "seeking and expecting complete closeout here, not an initial planning exercise," he also stated that, only under the best of circumstances, with the process moving like "greased lighting," could close-out be completed in four months. Mr. Neely and DOE–SAN realistically expected completion within a "four to 16 month[ ]" envelope. Pursuant to that time frame, DOE–SAN believed that the bulk of the physical work, including removal of equipment and bulk tritium, could be accomplished within four months and, therefore, the December 31, 1991 deadline was set by Mod 35.

2) *Level of effort required for close-out*

Plaintiff established that it never anticipated that all close-out work would be completed by December 31, 1991, or within the 9,946 DPMH reflected in Mod 35. Indeed, plaintiff's witnesses testified that during negotiations over Mod 35 plaintiff did not know the requirements for complete close-out of the contract and that the 9,946 DPMH estimate was preliminary and initial. Mr. Hennessey stated that plaintiff understood the 9,946 DPMH "to cover the initial closeout activities," and Mr. McCarthy understood the hours as "just an estimate of hours to do preliminary initial activities."

Since plaintiff was unsure of what level of effort was required for close-out, Mr. Hennessey emphasized that assurances of extension were a cornerstone of plaintiff's negotia-

tions: "If you're going to start doing work and you don't know how much work is going to have to be performed in order to complete the activity, you needed some type of assurance that you weren't going to get halfway down the pike and then the other side just walk[s] away." Mr. Hennessey added that, if plaintiff and DOE "were not going to be developing an agreement based upon a full understanding of what in fact was going to be required, we needed to go and be assured that there was not an ability for DOE to turn around and suddenly say well, gee we've got what we want, now everything else is your problem...." Plaintiff also introduced testimony and other evidence that DOE officials, including Mr. Neely, knew that the 9,946 DPMH contained in Mod 35 were insufficient to complete the D & D portion of close-out.

Plaintiff's assertion that at the time of entering into Mod 35 it had little conception of what was entailed in close-out is tempered by earlier requests for estimates. In this regard plaintiff's claims of ignorance cannot be wholly credited. As early as the Mod 22 negotiations, Mr. Schalin, DOE–SAN's then-Contracting Officer for plaintiff's contract, directed Mr. McCarthy to submit a formal cost and fee proposal with detailed technical backup for the assigned tasks and "close-out effort." That proposal was to include "contract closeout activities (including equipment disposition) ... [covering] the period beginning May 1, 1990 and ending December 31, 1990," although plaintiff was later directed not to include Chroma laser close-out costs in any proposal. Timothy M. Henderson, plaintiff's then-Senior Vice President of Technical Programs, subsequently wrote Mr. Neely on March 23, 1990, stating that plaintiff's proposals for Mod 22 were based on Mr. Schalin's directions "to include all close-out costs." (Emphasis omitted.) Plaintiff thus was aware, to some extent, that the expiration date and labor later included in Mod 35, substantially based on Mod 22, were neither wholly arbitrary nor based solely on initial close-out activities.

The appropriateness of allocating 9,946 DPMH for the close-out effort remarkably was relegated to a lesser status by both plaintiff and DOE during Mod 35 negotia-

tions. Plaintiff placed little emphasis on the total hours necessary.[2] Mr. Henderson recounted that at the time of Mod 22, plaintiff made no consideration of D & D or even disassembly of equipment for close-out purposes. Although Mr. Schalin directed plaintiff, by letter dated March 23, 1990, to consider "all closeout costs" (emphasis omitted), for Mod 22, Mr. Henderson testified that plaintiff "hadn't even considered D & D," but, rather, was contemplating administrative details and activities like packing and crating. Mr. Henderson also maintained that appropriate assumptions for close-out were never discussed with DOE officials during Mod 35 negotiations and that, therefore, any estimates of plaintiff's were unreliable. In sharp contrast Mr. Clark testified that at the time of the Mod 35 negotiations, the 9,946 DPMH included in Mod 35 was "taken for granted" by DOE as an accurate estimate for close-out. Mr. Clark's notes of the June 11 through 13, 1991 negotiations also reflect that Mr. Hennessey stated that Mr. Henderson and Mr. Neely believed the estimate to be correct as of the previous year.

### 3) Effect of the parties' intentions

Mod 35 contained a figure of 9,946 DPMH and an expiration date of December 31, 1991. Considering the preciseness of this number and date, it is remarkable that trial demonstrated neither to be realistic. The evidence showed that DOE never considered that close-out in its entirety, including D & D and required paperwork, would be completed by December 31, 1991. The same evidence revealed plaintiff's manifest ignorance as to the endeavor it was about to enter and naivete in relying on an introductory clause as a binding agreement for further close-out work. Plaintiff was requested as early as the Mod 22 negotiations for estimates of "all close-out." In response and throughout both the Mod 22 and Mod 35 negotiating periods, plaintiff provided minimal information based on inadequate inquiry into attendant duties.

The credibility of witnesses bears significantly on the court's findings. Messrs. Hen-

nessey and McCarthy were not as credible as Mr. Neely. The fact that plaintiff retained these past employees as consultants to testify did not impact the court's view; rather, the court weighed their lack of conviction against Mr. Neely's impressive and evident confidence in his testimony. Although the witnesses testified on somewhat different subjects (plaintiff's witnesses on the negotiating history of Mod 35 and Mr. Neely on DOE's expectations for plaintiff's close-out activities), the testimony of these witnesses that impressed the court dealt with the parties' intentions for close-out under Mod 35. Moreover, plaintiff alluded to difficulties with, or noncooperation manifested by, certain DOE personnel—Mr. Neely in particular. The court derived nothing of the sort either from Mr. Neely's testimony or from the documents for which he was responsible. He was candid and competent, although, like plaintiff's personnel, inexperienced in closing-out a facility containing a nuclear substance. Both Messrs. Neely and Clark overplayed the significance of December 31, 1991, as a realistic goal for close-out. However, Mr. Neely was persuasive that plaintiff had not developed a competent, reliable plan for close-out by late October 1991, and this posed the central difficulty to DOE in further extending the contract beyond December 31, 1991.

Based on these facts, the court finds that at the time the parties entered into Mod 35, both plaintiff and DOE were aware that some effort would remain following the December 31, 1991 expiration date. Further, at the time of entering into Mod 35, neither plaintiff nor DOE fully intended or expected that close-out would be completed in its entirety within the terms of the agreement. As to the extent to which the parties contemplated completion beyond December 31, 1991, defendant's testimony contained much greater strains of credibility than the assertions by Messrs. Hennessey and Long that extension as "necessary," as anticipated by Mod

---

**2.** Trial illuminated that the 9,946 DPMH figure was not derived primarily as an assessment of close-out effort. Mr. Henderson testified that the number originally was calculated by plaintiff as the remainder of effort available under the original ICF contract, as modified by Mod 22, following execution of plaintiff's primary duty to continue ICF R & D work.

35, remained wholly undefined.[3] Plaintiff presented no rational theory, through testimony or documents, that at the time of Mod 35's execution, DOE intended to enter into an open-ended contract with an expiration date wholly determined by plaintiff.

Trial helped explain the contradiction in Mod 35 between the fourth whereas clause, requiring extension, and the expiration date of December 31, 1991. A reading of the plain language failed to reveal the parties' intentions, while evidence at trial helped ascertain them. That evidence fully supports the finding that while the parties did not expect complete close-out by December 31, 1991, neither did Mod 35 amend the contract for extension in perpetuity, nor, as plaintiff argued, did DOE negotiate away its right to refuse to extend the contract for whatever period of time plaintiff required to effect close-out. Accordingly, it is the court's duty to construe the intentions of the parties from outside evidence. Of paramount importance to the formation of Mod 35 and its interpretation are the past dealings between the parties.

### 3. Past dealings and contract extension

Mod 35 by its terms explicitly extended the expiration date of plaintiff's contract until, at a minimum, December 31, 1991. Independently, this expiration date appears clear and unambiguous. However, when read in conjunction with the fourth whereas clause, the validity and finality of the date have been called into doubt. The meaning and significance of the stated expiration date must be determined.

Mr. McCarthy stated, as noted above, that the inclusion of December 31, 1991 in Mod 35 as the new expiration date held little significance for plaintiff, as the date seemed to be one of contractual formatting convenience. DOE placed a different reliance on the date. Mr. Neely testified that it was DOE's belief that the substantial bulk of close-out work could be accomplished by the end of the year,

including D & D, and that minimal effort would remain, primarily approval for disposal of wastes.

Mod 35 was an extensively negotiated document. Following denial of plaintiff's bid protest, the parties entered into intensive substantive negotiations, which included meetings at plaintiff's facilities and at DOE offices in Oakland, CA, telephone conversations, and drafts of the eventual agreement. One of the most consistent elements of these negotiations was the permanence of the stated expiration date of December 31, 1991.

This was not an element of the contract that was lacking in significance. Although plaintiff may have viewed the expiration date as one of mere convenience, that was not DOE's view. Neither party asserted at trial that it expected to sign an agreement without an expiration date, but Mr. McCarthy's testimony that the date was insignificant is both unconvincing and unsettling. That a sophisticated contractor would enter into a contract professing a lack of knowledge as to what type of work and what level of effort were required evidences a cavalier disregard as to the level of commitment necessary to execute the contract.

An expiration date of December 31, 1991, was chosen for a reason. Mod 35 required an expiration date. That much is undisputed. Further, the inclusion of an expiration date was the regular course of dealing between plaintiff and DOE. Each previous agreement entered into, including the original contract and Mod 22, contained an explicit expiration date. The original contract was for a three-year term with two, ultimately unexercised one-year extensions, thereby expiring on April 30, 1990. Mod 22, by option B, extended the contract until March 31, 1991. The parties never considered these expiration dates to be superfluous to the agreements. Inclusion of expiration dates was part of the regular course of dealing between the parties.

---

**3.** The court credits Mr. Hennessey's assertions, as reflected in the notes of the July 19, 1991 negotiating session, that Mod 35 did not give DOE a unilateral right to determine the close-out effort required of plaintiff. What remained unarticulated in Mod 35, however, was DOE's obligation to continue the contract open-ended until plaintiff completed close-out. The evidence establishes that the parties always intended that any additional periods of contract performance would be implemented by bilateral extensions.

The expiration date of plaintiff's contract was set at December 31, 1991, but the finality of that date was tempered by the fourth whereas clause contemplating extension. The evidence showed that the parties anticipated some close-out work beyond the expiration date. However, the mere anticipation of additional work did not, in and of itself, bind the parties to an inevitable, undetermined fate. Plaintiff did not negotiate, nor did the parties agree to, an undefined expiration period. Nor did the parties agree to a mere agreement-to-agree, for such contracts traditionally are illusory.

The court must construe DOE's contractual duty to extend the contract in light of the parties' past dealings, the expectation of continued work beyond the expiration date, and the progress of the contract at the time DOE decided not to extend it further. These parties were bound together in a unique manner. DOE's equipment and materials were in the hands of plaintiff, a private party, and DOE needed to retrieve them. However, plaintiff was under no obligation to continue work under the limitation-of-costs and -funds provisions of the contract. Plaintiff's and DOE's fates in completing close-out were inexorably linked.

A near complete dearth of case law exists concerning the Government's duty to extend a contract in like circumstances. At the close of trial, the parties were offered the opportunity to file post-trial briefs with citations to any relevant cases.

Plaintiff asserts that *Everett Plywood Corp. v. United States*, 206 Ct.Cl. 244, 512 F.2d 1082 (1975), involved a similar situation. The Court of Claims held that the Government was liable for breach of contract due to its decision not to extend a contract based on an alleged lack of performance, despite the existence of an implied term requiring an extension unless a specified condition was present. Plaintiff argues that in *Everett*, as well as in this case: 1) The expiration date of the contract was so unrealistic that it was clear the parties contemplated, at the time they entered into the contract, that extensions would be requested by plaintiff; 2) the Government was required to extend the con-

tract; and 3) the Government breached its obligation to extend the contract.

Defendant offers several distinctions between *Everett* and the case at bar. In *Everett* the Government's decision not to extend the contract was in clear violation of Forest Service policy that "[e]xtensions were regularly granted...." *Id.* at 250, 512 F.2d at 1086. The Forest Service Handbook stated that contract extensions would be granted unless it would be "disadvantageous to the United States," and the court found that "extensions of contracts were granted ... with very little urging." *Id.* at 250, 512 F.2d at 1086. The Court of Claims ultimately determined that the Forest Service breached the contract because, in violation of its regulations, the Forest Service failed to make any finding involving disadvantage to the Government. *Id.* at 256–57, 512 F.2d at 1089–90. In contrast DOE was operating under no similar guidelines, nor was it DOE's practice regularly to extend the contract. Rather, the practices of the parties in this case, as to extensions of the contract per Mod 22 and Mod 35, followed a regular pattern of extensive negotiation. *Everett* is not persuasive because it does not approximate the parties' situation in this case.

In the case at bar, the parties did not expect close-out to be completed before December 31, 1991. Although DOE did expect that the bulk of work would be completed before that date, plaintiff was aware of only the basic requirements of the close-out process. With these expectations in mind, the parties entered into Mod 35. At the time of negotiations and based on their expectations, the parties crafted an agreement that was neither entirely unrealistic nor incompatible with their expectations, in contrast to *Everett*. This is evident primarily because DOE's assumptions were well grounded, but additionally because plaintiff entered into Mod 35 without substantial knowledge of what it had agreed to perform.

Lacking an independent obligation to extend the contract, as in *Everett*, DOE's decision not to extend the contract must become the primary focus of analysis. This contract did not bind plaintiff and DOE to an open-ended fate predicated on a subjective analy-

sis by plaintiff as to the "necessity" to extend and based solely on plaintiff's pace of performance. However, as noted, the parties clearly contemplated completion of some work beyond the expiration date. As that expiration date approached, and plaintiff's progress in developing an acceptable close-out plan and estimate came into question, DOE decided to preclude further extension. Whether that type of decision was allowed under Mod 35 and whether it was justified in the circumstances become the ultimate arbiters of the extent of DOE's liability to plaintiff.

#### 4. DOE's decision not to extend
##### 1) Labor and costs

On August 15 and 23, 1991, plaintiff submitted to DOE two close-out plans containing labor estimates. On October 25, 1991, plaintiff offered, at DOE's request, labor and cost estimates for work beyond 1991. Each proposal contained a dramatic increase in estimated hours necessary for completion of close-out, such that Mr. Neely characterized the process of determining total costs and hours "like chasing a moving target." He also described the plans as "out of control ... [with] no indication that either the estimated number of hours to complete the job or the estimated cost to complete the job w[ere] still stabilizing." The steadily increasing estimates were central to DOE's decisions not to extend the contract beyond December 31, 1991, and to have DOE complete close-out work.

On August 15, 1991, per requirements of Mod 35 and Task No. 91KM02, plaintiff submitted its first close-out plan to DOE. The August 15 plan was qualified by noting "that significant task changes, additions and scheduling changes may be required. In addition, the plan will undoubtedly require revision as it is implemented." Among the 17 tasks laid out by the plan was Task 16 for "Radiological and Chemical Safety." By that task plaintiff intended to "decontaminate and decommission the tritium facility. KMS will assess and decontaminate the remainder of the facilities as required." Estimates included some work through at least the second quarter of 1993. The total estimated hours required were 13,594.66 DPMH, an objectively

significant increase above the only stated estimate to date of 9,946 DPMH contained in Mod 35. Appropriately excluded from the draft plan was a cost proposal, since the plan was not a formal cost proposal.

Plaintiff subsequently sent a second close-out plan, labeled "[r]evised," on August 23, 1991. The parties disputed the necessity and appropriateness of this plan. According to Mr. Long, the second plan was submitted to account for omitted information and areas that needed revision, but primarily in response to requests made by DOE as to certain areas of close-out. The plan contained a new estimate of 22,231 DPMH to complete close-out with work extending into the first quarter of 1994. According to Mr. Neely, plaintiff offered no explanation for the changes, outside of the plans themselves, and the second plan was neither solicited nor welcome. The lack of explanation therefore required a difficult side-by-side comparison and wasteful termination of DOE's analysis of plaintiff's earlier plan. Nevertheless, according to Mr. Long, DOE never complained directly to plaintiff about the second plan's increase in estimated hours or the extension of effort into the first quarter of 1994.

The necessity and appropriateness of the second plan are not determinative of this case. What was of paramount importance to DOE was the additional increase in effort required to complete the contract. An explanation for the increase, offered by Mr. Henderson, was that the second plan included some 660 additional hours for security and the addition to the plan of 3,500 DPMH for a project manager, as well as a significant expenditure for "waiting for work," the later category included to avoid unnecessary delays or costs while plaintiff awaited close-out directives.

On October 4, 1991, Ms. Richards formally requested plaintiff to submit a plan with explicit details for proposed close-out work beyond December 31, 1991, which plaintiff offered on October 25, 1991. This proposed plan contained an estimated 31,408 DPMH for close-out work from 1992 through the first quarter of 1994. Plaintiff's proposal was qualified in two major respects: 1) that all DOE property could not be removed from

the East Wing of plaintiff's facilities by December 31, 1991; and 2) that plaintiff could not ship the DOE-owned tritium inventory to GA in 1991 due to safety concerns. This was the first notification to DOE of plaintiff's intention not to ship the tritium out of plaintiff's facilities in 1991. The plan contained an additional caveat whereby plaintiff notified DOE that plaintiff would "not even begin preparation of the NRC plan until 1992," and thereby "the actual costs, labor, and schedule for this task may vary significantly from those submitted in this proposal." [4] By this proposal plaintiff estimated 5,149 DPMH to complete the NRC plan.

2) *Nature of decision not to extend*

From DOE's point of view at the time of close-out, a reasonable, objective review of plaintiff's estimates of labor and costs required to complete close-out justifiably would cause concern regarding plaintiff's ability to complete the work in an economical and timely manner. These increasing proposals were of legitimate and paramount concern to DOE officials.

Throughout fall 1991, as close-out work continued, plaintiff presented its close-out proposals, and disputes continued to arise over access to plaintiff's facilities. Mr. Keheley, then-Assistant Manager for Defense Programs, was briefed by DOE staff—including Ms. Day, then-Director, Contracts Division; Mr. Wilhelm, the Contracting Officer's Technical Representative, DOE–SAN for plaintiff's contract following Mod 35; and Susan Brechbill, Assistant Chief Counsel, DOE–SAN—and determined that it would not be in the best interests of the Government to continue funding the contract. Messrs. Long and Hennessey were informed in person at plaintiff's facilities by Mr. Keheley, Ms. Day, Ms. Brechbill, and Mr. Chang on November 21, 1991, of DOE's intention not to extend the contract. Terry A. Vaeth, then-Acting Manager, DOE–SAN, confirmed the decision by letter dated November 27, 1991.

The parties disputed the basis for DOE's decision not to extend plaintiff's contract. According to Mr. Keheley, the increasing estimates of required hours; the increasing estimates of costs; the inability to obtain funds from DOE Headquarters in Washington, DC; and a general difficulty in moving the contract forward led to the conclusion that DOE would not extend the contract beyond December 31, 1991. Plaintiff, however, attempted to elicit testimony to the effect that the decision not to extend the contract was based on funding, an uninformed analysis of plaintiff's proposals, and a spurious desire to terminate plaintiff's contract.

· Mr. Keheley was the cognizant DOE–SAN official who made the final decision not to

---

4. Plaintiff's estimated costs also increased during a similar period at a similar rate. On August 8, 1991, plaintiff presented DOE with an estimated cost of approximately $6,200,000.00 for close-out to the extent contemplated by Mod 35. By Mr. McCarthy's limitation-of-funds letter of October 1, 1991, plaintiff requested an additional $6,008,691.00 to fund the cost and fee on the contract through December 31, 1991. Mr. McCarthy also estimated that the total cost-plus-fixed-fee at completion would be $78,901,721.00. By plaintiff's October 25, 1991 proposal for close-out activity beyond December 31, 1991, plaintiff estimated that $14,556,161.00 would be necessary to complete close-out.

Actual costs for individual tasks were unknown to DOE as the close-out proposals did not contain individualized cost information. This information was not required as part of plaintiff's close-out plans. However, Mr. Neely stated that DOE nevertheless was surprised and concerned that plaintiff had not offered any cost information as the labor estimates for close-out increased from 9,946 DPMH by Mod 35, to nearly 41,000

DPMH by the October 25 proposal. In such a situation, according to Mr. Neely, DOE "would at least expect a phone call or a conversation or letter or something telling us whether that increase in hours was going to have an effect on the cost." Accordingly, DOE's "concern was that the hours went up, and we don't know what's happening with the cost. There was no information to make us feel more comfortable in that regard."

The court recognizes that plaintiff's projected costs were high due to its rates for indirect labor, which mushroomed after its R & D work concluded. From this plaintiff argues that the focus should be on its DPMH estimate, which was reasonable. Ultimately, DOE accomplished close-out at 31,368 DPMH (including hours attributable to a contractor that was replaced), as opposed to plaintiff's final estimate of 31,408 DPMH. This correlation could demonstrate the reasonableness of plaintiff's October 25, 1991 estimate, but DOE was in no position to conclude that this was plaintiff's final estimate, given the dramatically escalating estimates in the August 15, August 23, and October 25 proposals.

extend plaintiff's contract. He made that decision after consulting other DOE–SAN officials and following a trip to Washington, DC, to consult with DOE officials. The decision was based upon those briefings and discussions and reflected two grounds: 1) that the escalating level of effort and costs required by plaintiff caused him to believe that "it was becoming very difficult to keep the contract moving forward;" and 2) that DOE was unable to obtain additional funds from DOE Headquarters in Washington, DC. Mr. Keheley testified:

> The problem that I was having at the time, I had gone back to headquarters, you know, two times ... in one year trying to seek additional funds to keep the contract going and when we received the ... $4.9 million, ... the story that I was given was, "Don't come back again. There are no additional funds to put into this contract." And so I ... was, you know, in a dilemma from a management standpoint in terms of ... how to continue ... to keep that contract in place when I had a limit on the ... total amount of funds at that particular point in time. And the costs, you know, continued to escalate even beyond the point where I was able to obtain the $4.9 million.

Certain documents culled from DOE's files display sentiments hostile to plaintiff. For example, notes prepared by an unnamed author for a November 12, 1991 briefing to Mr. Vaeth indicate that one of DOE–SAN's considerations was "identifying ... the tasks and risks of kicking KMS ass out and doing the work ourselves." A draft document entitled "Pros and Cons of Contract Extension vs Contract Expiration," prepared by an unnamed author and dated November 18, 1991, with facsimile transmission markings, states positively that allowing expiration "[w]ill reduce KMS cash flow to the point that KMS may be more willing to cooperate on possible negotiations for D & D effort." The testimony of Mr. Neely also included references to an unwillingness to continue working with plaintiff. Mr. Neely recalled stating to Mr. Henderson during the contract negotiations that "we want to get out of Michigan."

The testimony and documentary evidence which purports to establish DOE's pretextual nature for terminating the contract, based on inappropriate financial concerns and a desire to damage plaintiff, fails to undermine the much larger body of evidence supporting the reasoned decision-making process by the responsible DOE officials. The documents and testimony relied on by plaintiff cannot be characterized, in their worst light, as wholly end-driven.

Mr. Keheley explained to Mr. Long, during the November 21, 1991 meeting, the multiple considerations upon which DOE decided not to extend the contract, wherein he recounted:

> I informed him that it was DOE's decision not to extend the contract beyond December 31 of 1991 and we then went through some of the issues that were—that were bothering the department, you know, such as the escalating costs, the issues with—with work performance, with tasks, you know. Some of the issues surrounding tasks not being completed in a timely ... manner.

Ms. Day testified similarly:

> Q  Why was the decision made not to extend the contract ...?
>
> A  Well, for the same reasons I guess that I felt the need to get involved, and that is that the contract was out of control.
>
> We looked at it, and it looked like a lot of the reason for it being out of control was that it was an R & D cost type contract for work which was not R & D any longer. It was close-out of facilities, which is a more definitive type of an activity and not really as conducive to a research and development type contract.
>
> We had no control over it, so we thought we needed a different vehicle to try and get a handle on these escalating costs and to try and get the performance taken care of and get the property to GA.
>
> Q  Do you recall how that decision was made? Was it in one meeting or multiple meetings?
>
> A  We had several meetings discussing the subject. I don't remember specific meetings, but I'm sure that staff was in-

volved and asked about it and consulted and so was our manager.

Objectively, the increasing labor estimates for close-out are disconcerting. The numbers themselves were belied by plaintiff's uncertainty, throughout the close-out period in the fall of 1991, of what was actually required to complete the process. Mr. Henderson, plaintiff's former Senior Vice President of Technical Programs, testified that as of the first close-out plan on August 15, 1991, plaintiff still had little idea of what was involved in D & D, and that plaintiff was "still in the learning process" when it submitted its second plan on August 23, 1991. Plaintiff's plans are evidence of this uncertainty.

DOE's final concern was over the appropriateness of continuing plaintiff's contract by modification. Mr. Vaeth stated in his November 27, 1991 confirmation letter to Mr. Long:

This is no longer an R & D effort and the current contract is no longer the appropriate vehicle for the work remaining to be accomplished. It is our intention, however, to provide a payment mechanism (probably in a modification to the contract) whereby KMS could continue to be reimbursed for certain specific costs beyond the period of performance, e.g., lease costs.

Additional modification of the contract did not occur, so Ms. Day unilaterally executed an "Obligation Memorandum" on February 26, 1992, purporting to be the appropriate vehicle for payments to plaintiff.

Plaintiff insisted that the contract simply should have been extended, as required per Mod 35, but Ms. Richards testified that it was inappropriate based on the close-out work that plaintiff was currently performing:

Q Do you believe that a contractual vehicle would have been necessary if all or part of the D & D was required to be performed after December 31, 1991?

A It is my understanding today and belief today that you would have.

Q You would have to have a contractual vehicle?

A A new contract.

Q A new contract?

A Yes.

Q Why could you not extend this contract?

A Based on the type of contract we had. This is a ... [cost-plus-fixed-fee] contract. There are two types. One is term, and one is completion. This is a term contract. It has a specified level of effort.

If in fact the hours had been extended under that specified level of effort and the term had been expended, then the FAR clearly states that you would have to go out and have a new acquisition. We have a specified term of performance.

Although Ms. Day's and Ms. Richards' testimony could be construed as DOE's belated realization that it used the wrong contract vehicle and stopped plaintiff for that reason, the thrust of their testimony was that the contract vehicle had not worked because it was inappropriate and, therefore, could not continue into the future.

Again, credibility determinations play a role in the court's findings. Despite the inarticulate rendition of his testimony on the transcript, Mr. Keheley was a most impressive witness. By demeanor, forthrightness, and rectitude, he conveyed the seriousness of his decision; he outright condemned the inappropriate memoranda indicating mala fides by DOE staff regarding plaintiff. Plaintiff sought to portray DOE as the dog in the manger, but apart from the memoranda discussed above, no DOE witness displayed anything approaching animus toward plaintiff. The tenor of DOE's witnesses was sadness at a once good relationship gone awry due to the misunderstandings concerning close-out.

DOE's decision-making process included consideration of the benefits of ending what had become a difficult relationship with plaintiff, a concept that may very well have pleased DOE officials. However, the small amount of evidence that might indicate a pretextual result is outweighed by evidence showing the reality of plaintiff's contractual standing and the progress of close-out near the end of 1991.

#### 5. *Reasonableness of decision not to extend the contract*

The court cannot imply into the contract terms whereby the execution of Mod 35 allowed plaintiff to usurp the role of the contracting officer and retain full control over performance of the contract. Such an interpretation is not reasonable in light of either the parties' past dealings, their intentions, or any objective construction of the contract. The contract cannot be construed so as to extend *ad infinitum* regardless of the amount of time it took to complete close-out. Contrary to its assertions, by Mod 35 plaintiff did not retain an absolute right to close-out.

Plaintiff's burden is to prove by a preponderance of the evidence an entitlement to judgment as a matter of fact and law. Plaintiff has not met that burden. Undisputed is that the parties entered into an agreement, per Mod 35, to close-out the contract. Plaintiff maintained throughout trial that Mod 35 was never intended to encompass complete close-out, but was for the more modest endeavor of initial close-out activities. That assertion is not credible. The evidence was persuasive that, at the very least, Mod 35 contemplated the bulk of close-out work be completed before December 31, 1991. The evidence further showed that, despite DOE's assertions, close-out would not be entirely complete, except under the most fortuitous circumstances, before December 31, 1991.

Given the paradoxical nature of the contract, *i.e.*, contemplating work beyond the expiration date while vaguely defining the nature or duration of that expectation, DOE faced a difficult decision as the end of 1991 approached. Plaintiff's performance was not acceptable. Estimates for labor and costs were skyrocketing. Plaintiff was no longer employed by DOE for R & D purposes, but, rather, for basic cleanup efforts, which plaintiff was undertaking with difficulty. In light of this situation, DOE's decision not to extend the contract was reasonable and based on an informed inquiry.

Although the facts support the reasonableness of DOE's decision, the further question becomes whether that decision nevertheless constituted a breach of plaintiff's contract. To that inquiry, the answer must be negative. The essence of plaintiff's argument is that DOE, by Mod 35, bargained away its right not to extend the contract and DOE breached that bargain by deciding not to extend. That position is untenable.

Under the contract, as altered by Mod 35, plaintiff had to incur costs—such as security and lease payments—whether it was actively involved in close-out or not. Primarily due to the uncertainty of plaintiff's estimates and performance, DOE decided that, following expiration of Mod 35, plaintiff would perform no additional close-out work. In recognition of plaintiff's obligations, Ms. Day executed the "Obligation Memorandum." DOE's recognition of continued obligations, through either the Obligation Memorandum or through implied terms in the contract, did not by itself bind plaintiff and DOE to complete the close-out together and at plaintiff's heed.

Neither the language of Mod 35 nor the expressed intentions of the parties support an interpretation that extension of the contract was based on the subjective needs of plaintiff. That type of contract would require extension solely based on plaintiff's performance, an interpretation not supported by the evidence. Moreover, the language of Mod 35 purporting to require extensions is, at best, an agreement to agree. That agreement never occurred between the parties.

The parties were involved in a situation in which time was of the essence, as delayed close-out inevitably generated greater costs. Plaintiff's performance following the execution of Mod 35 was objectively suspect. The close-out of this contract was further complicated based on the nature of D & D of nuclear contaminants. Rather than continue to rely on a difficult contractor, DOE made a final decision to attempt completion of close-out under its own direction. That decision, viewed both from the time period for decision and with hindsight, appears objectively reasonable.[5]

---

**5.** In view of the court's findings and conclusions, it is unnecessary to address damages. Because

DOE did not breach the contract, plaintiff held over on its own account. Although plaintiff was

Plaintiff has failed to prove by a preponderance of the evidence that the parties intended by Mod 35 that the extension of the contract was mandatory and not at the discretion of both parties and that DOE breached the contract. Neither the language of Mod 35 nor the parol evidence of the parties' intent supports such an interpretation. Further, the decision not to extend the contract was reasonable, based on an informed process, and reflected appropriate considerations.

## CONCLUSION

Accordingly, based on the foregoing, the court finds and concludes that plaintiff has failed to prove by a preponderance of evidence that DOE breached Mod 35. The Clerk of the Court shall enter judgment for defendant and dismiss the first amended complaint.

**IT IS SO ORDERED.**

No costs.

solely obligated under its license from the NRC, no evidence suggested that in January 1992 DOE could not have taken over plaintiff's responsibilities as it did, under its own authority, in January 1994. However, if the Michigan litigation somehow were viewed as perpetuating stasis, such that plaintiff had no option to release the facilities to DOE until DOE's replevin action was concluded, plaintiff did not prove damages attributable solely to that period above the $2 million that it already received. Alternatively, if the record contains such evidence, the court has no base for making an allocation attributable to that period.