**ATLANTIC DIVING SUPPLY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**and**

**VF Imagewear, Inc., Defendant–Intervenor.**

No. 11–894C.

United States Court of Federal Claims.

Oct. 11, 2012.*

---

* OPINION ORIGINALLY FILED UNDER SEAL ON SEPTEMBER 27, 2012

Ronald Kenneth Henry, Washington, DC, for plaintiff.

Matthew Francis Scarlato, United States Department of Justice, Washington, DC, with whom was Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director, for defendant.

Scott Arnold, Washington, DC, for defendant-intervenor.

## OPINION

FIRESTONE, Judge.

Plaintiff Atlantic Diving Supply, Inc. ("plaintiff" or "ADS") filed this bid protest action against defendant the United States ("the government"), alleging that the government acted arbitrarily and capriciously when it awarded a contract for the provision of civilian uniforms for Department of the Interior ("the Agency" or "DOI") employees to defendant-intervenor, VF Imagewear, Inc. ("VF"). Pending before the court are the parties' cross-motions for judgment on the administrative record. For the reasons discussed below, the government's and VF's cross-motions are **GRANTED,** and plaintiff's motion is **DENIED.**

## I. BACKGROUND

### A. The Solicitation

The following facts are taken from the administrative record ("AR"). On May 5, 2011, the Agency issued Request for Proposals No. P12PS20001 ("Solicitation"), seeking the provision of civilian uniforms for approximately 30,000 Agency employees. The Solicitation sought a contractor to provide all services related to the purchase, manufacturing, and distribution of over 500 items directly to Agency employees.

The Solicitation provided that the contract award would be based upon the offeror who provided the best value to the government, and established three areas of evaluation—technical, past performance, and price. To evaluate an offeror's technical capabilities, the Solicitation requested that offerors submit "a technical description of the services being offered in sufficient detail to evaluate compliance with the requirements in the Statement of Work," found in Section C of the Solicitation. AR 1011. It further explained that the Agency would evaluate offers "solely on the information provided in the proposal and will not assume that an Offeror possesses any capability unless specified in the proposal." AR 1020. The Solicitation cautioned that "[o]missions, inaccurate, or inadequate information may have negative effects on the overall evaluation." *Id.* The Solicitation made clear that the Agency "reserve[d] the right ... to award a contract based on initial offers received without discussion of such offers." AR 1021.

The Solicitation contained five different areas of evaluation for the Statement of Work called "Functions," found in Section L.6.3 of the Solicitation: (I) Project Management and Quality Control, (II) Manufacture and Distribution of Uniforms, (III) Centralized Uniform Allowance Control Database System, (IV) Uniform Inventory and Control System, and (V) Customer Service, Research, and Special Needs. The Functions were evaluated according to three or four different "Factors," found in Section M.5.2 of the Solicitation: (A) Technical Approach, Program Management and Quality Control and Experience, (B) Personnel/Management Capability, (C) Contract Phase In/Phase Out Plans, and when applicable, (D) Database Screenshots or Samples. In addition, an offeror was required to submit uniform "like items" for the Agency to evaluate, and a past performance questionnaire was used to collect information about an offeror's past performance.

Under this evaluation approach, the Agency created a scoring chart to reflect its evaluation of each offeror's technical proposal, past performance, and uniform samples. An evaluation panel reviewed the technical portions of the responsive proposals according to this scoring chart and provided a written summary of their results to the contracting officer. The evaluation scoring chart, representing the maximum technical score obtainable, was as follows:

| Evaluation Factors | Contractor Functions | | | | | Total |
|---|---|---|---|---|---|---|
| | (I) Project Management and Quality Control | (II) Manufacture and Distribution of Uniforms | (III) Centralized Uniform Allowance Control Database System | (IV) Uniform Inventory and Control System | (V) Customer Service, Research, and Special Needs | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Factor A: Technical Approach, Program Management & Quality Control, and Experience | 75 | 75 | 75 | 75 | 75 | 375 |
| Factor B: Personnel/ Management Capability | 75 | 75 | 75 | 75 | 75 | 375 |
| Factor C: Contract Phase–In and Phase–Out Plans | 30 | 30 | 30 | 30 | 30 | 150 |
| Uniform Samples | | | | | | 150 |
| Past Performance | | | | | | 300 |
| Total | | | | | | 1350 |

AR 1021, 1025.

The maximum score under this system was 1350 points. Past performance was graded based upon a scale of −300 to +300, with 0 representing a neutral score. Uniform samples were assigned one of three scores (0, 75, or 150), Factors A and B categories were assigned one of four scores (0, 25, 50, 75), and Factor C categories were assigned one of four scores (0, 10, 20, 30). A score of 950 points and higher was considered an "acceptable" technical proposal, and a score of less than 950 was deemed "unacceptable." All "acceptable" proposals would then be evaluated according to price.

In addition to outlining the evaluation approach, the Solicitation described the technical evaluation procedures in Section M.4. This Section stated that after conducting the technical evaluation, the "evaluation team will provide a written summary of the evaluation results to the Contracting Officer." AR 1021. The Solicitation also noted that "the Contracting Officer along with the evaluation team will make a determination of whether to award without discussions. The Government reserves the right ... to award a contract based on initial offers received without discussion of such offers." *Id.*

On February 23, 2011, the contracting officer issued an internal appointment letter ("Appointment Letter"), establishing the Technical Evaluation Panel ("TEP") that would review each proposal. The Appointment Letter provided guidance as to how the TEP would perform the evaluation of each proposal:

Evaluations will be conducted in accordance with the requirements of the statement of work and as defined in this solicitation.... Evaluators may not use knowledge of proposals from any source other than the proposals themselves, nor may they make any assumptions or extrapolations in areas where the proposals are unclear. A summary of any unclear areas should be included in your evaluation summary. These will be discussed if it is determined that discussions are necessary....

Each evaluation panel member ... must evaluate each proposal independently of the other panel members and must document for the record each of their individual findings....

After each of you has fully evaluated each proposal, all members must convene as a team to arrive at a team consensus evaluation for each mandatory requirement and each technical evaluation factor for each proposal.

A Technical Evaluation Report must be prepared for the [Source Selection Official], and include a narrative evaluation specifying the strengths and weaknesses of each proposal and any uncertainties, reservations, qualifications or areas to be addressed, which may affect the selection of the source for award. The report should include specific points and questions to be raised if subsequent discussions are held with the offerors. A determination of technical unacceptability must be sup-

ported with concrete technical data and must indicate whether the proposal is capable of being made acceptable through discussions. Since the narrative forms the basis for later discussions and debriefings, specific references and terms must be used. AR 1483–84. The TEP also issued a source selection plan on March 16, 2011, which provided further guidance on how proposals should be scored. The source selection plan stated that "each TEP member [would] independently complete an assessment of each proposal and assign an objective rating to each of the technical evaluation criteria. The TEP, as a whole, [would] then discuss the individual ratings assigned and come to a consensus." AR 2520. The TEP was instructed to "evaluate each proposal strictly on its content and [ ] not to assume that performance will include anything not specified in the proposal." AR 2521. The TEP was instructed to use the following scoring criteria for Evaluation Factors A through C:

| Points | Criteria |
| --- | --- |
| ["Outstanding" Score: 75 points for Factors A and B or 30 points for Factor C] | Offeror demonstrates outstanding approach and related experience in [the particular Factor]. The offeror instills a high degree of confidence that the requirements in the Statement of Work will be met efficiently and effectively. The offeror has many years of related experience. |
| ["Good/Satisfactory" Score: 50 points for Factors A and B or 20 points for Factor C] | Offeror demonstrates a good/satisfactory approach in [the particular Factor]. The offeror instills a moderate degree of confidence that the requirements in the Statement of Work will be met efficiently and effectively. The offeror has some related experience. |
| ["Marginal" Score: 25 points for Factors A and B or 10 points for Factor C] | Offeror demonstrates marginal approach in [the particular Factor]. The offeror instills little confidence that the requirements in the Statement of Work will be met efficiently and effectively. The offeror has little related experience. |
| [Zero] | Offeror is non-responsive. No evidence of being able to adequately address [the particular Factor]. The offeror instills no confidence that the requirements in the Statement of Work will be met efficiently and effectively. The offeror has no related experience. |

*See* AR 2521; AR 2216 (example scoring sheet). The source selection plan stated that the TEP's ratings would "be used to provide support recommendations of source selection and will reflect as accurately as possible the substantive aspects (positive or negative) of the proposals." AR 2520. The source selection plan also indicated that the "Government intends to evaluate proposals and reserves the right to award a contract without discussions with offerors." AR 2522.

## B. The Agency's Initial Award

The Agency received proposals from three offerors: ADS, VF, and * * *. According to its proposal, ADS had completed similar work on several military supply and other agency contracts. VF was the incumbent contractor for the work under the Solicitation.

After conducting individual technical evaluations, the TEP held a conference call to arrive at a consensus evaluation. These consensus evaluations gave VF a score of 1225, * * *, and ADS a score of 645. Because it received a score of less than 950, ADS's proposal was found to be technically "unacceptable." In explaining ADS's technically unacceptable rating, the TEP stated:

It was mutually agreed upon that ADS' technical proposal did not address the RFP [Request for Proposals] and/or the requirements of the program. In fact their proposal seemed to be a collection of screen prints and information from a company brochure. It was extremely inadequate. They did not address the specifics

of the RFP, nor did they appear to reflect the capability to do such. The team determined that ADS was probably not capable of "being made acceptable" to manage this program and contract. Thus, ADS was far from meeting the 950 points required to be deemed technically acceptable and eliminated from competition.

AR 2620. The contracting officer's source selection statement found that ADS's low score "appears to reflect major issues or deficiencies with their capabilities and perhaps their knowledge of the product and program requirements." AR 1890. The contracting officer further provided a list of 21 weaknesses that contributed to this score, including ADS's failure to address numerous requirements, such as a quality assurance plan, allowance system, year-end requirements, special purchase items, and to provide uniform samples that satisfied the specifications in the Solicitation. AR 1890-91. When summarizing her findings in the source selection statement, the contracting officer observed that ADS's pricing was * * * the Agency's Independent Government Estimate ("IGE"), which "indicates [a] lack of knowledge of [contract] requirements." AR 1891.

Out of the remaining two offerors, VF submitted the lowest price proposal. The VF proposal was * * * the IGE and the * * * than the IGE. AR 1890-91. Given VF's technical ratings and price proposal, the Agency determined that VF's proposal provided the Agency with the best value and VF was awarded the contract. The Agency issued its source selection decision on August 24, 2011. AR 1891-92. On September 1, 2011, the contracting officer notified ADS that VF had been awarded the contract. On September 29, 2011 the Agency held a debriefing with ADS.

On October 4, 2011, ADS filed a bid protest with the Government Accountability Office ("GAO") and a stop-work order was issued for VF's contract award. ADS alleged that the Agency had conducted defective evaluations of ADS and VF, failed to follow evaluation criteria as required by the Solicitation, failed to apply the criteria evenly to ADS and VF, and conducted an improper best value analysis. AR 2057. On October 12, 2011, the Agency notified the GAO that it intended to take corrective action, and sought dismissal of ADS's protest. AR 2092-93. The Agency stated that the TEP would reconvene and reevaluate all proposals and then render a new contract award. *Id.* Based on that statement from the Agency, the GAO dismissed ADS's protest as academic on October 14, 2011. AR 2091.

## C. The Agency's Reevaluation and Final Award

Pursuant to the corrective action plan, the TEP conducted a second round of individual evaluations. The TEP then conducted a conference on November 2-4, 2011, to complete the consensus evaluations. After the reevaluation, the TEP arrived at consensus scores of 1250 for VF, * * *, and 825 for ADS. VF's score increased by 25 points and ADS received 180 additional points. Despite that increase, ADS's proposal remained 125 points below the minimum to be deemed technically acceptable.

In addition, the technical evaluation team leader, * * *, later conducted another review of ADS's proposal to assist in responding to one of ADS's protests before the GAO, and found that ADS's consensus evaluation mistakenly accounted for two weaknesses in the wrong Factor/Functions. AR 2211. He determined that moving the first weakness to the correct Factor/Function would not have altered ADS's score, and moving the second would have resulted in an increase from 25 to 50 in Factor B, Function IV. *Id.* However, even with this change, he explained that, at best, ADS's score would be increased to 850, which remained 100 points below the threshold to be deemed technically acceptable. *Id.*

Pursuant to the Solicitation, the TEP provided a "written summary of the evaluation results to the Contracting Officer." AR 1021 (Solicitation); AR 2464 (written summary). The contracting officer subsequently conducted price evaluations in accordance with the Solicitation, rendering essentially the same findings as in the first source selection statement. AR 2461-62. Because the Agency again found that VF's proposal provided the best value to the government, the Agency

lifted the stop-work order on VF's contract award on November 9, 2011. AR 2463–64.

ADS sought debriefing on the Agency's second award decision to VF, which the Agency provided on November 17, 2011. The debriefing again indicated that ADS failed to address several aspects of the Solicitation, and concluded that ADS did not "submit a technical description of the services being offered in sufficient detail to evaluate compliance with the requirements of the Statement of Work." AR 2470; *see also* AR 2467–72 (listing the weaknesses in ADS's proposal). On November 22, 2011, ADS filed its second bid protest with the GAO. It argued again that the Agency conducted defective evaluations of ADS and VF, failed to follow evaluation criteria as required by the Solicitation, failed to apply that criteria evenly to ADS and VF, and conducted an improper best value analysis. AR 2487–2515.

On December 21, 2011, ADS filed suit in this court, before its second GAO protest had been resolved. ADS filed its motion for judgment on the administrative record on April 13, 2012, the government and VF have filed their cross-motions, and briefing is now complete. Oral argument was heard on September 20, 2012.

## II. STANDARD OF REVIEW

The applicable standard of review in a bid protest is provided by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A): "a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Al Andalus Gen. Contracts Co. v. United States,* 86 Fed.Cl. 252, 262 (2009) (quoting *Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1350–51 (Fed.Cir. 2004)). That standard permits the court to set aside a federal agency's procurement decision if either "'(1) the procurement official's decision lacked a rational basis, or (2) the procurement procedure involved a violation of regulation or procedure.'" *Id.* at 263 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001)).

The standard for determining whether an agency's decision lacks a rational basis, as argued here, is highly deferential. Contracting officers are "'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Impresa,* 238 F.3d at 1332 (quoting *Latecoere Int'l, Inc. v. Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994)). Thus, the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Impresa,* 238 F.3d at 1333 (quoting *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir.1994)). The Court "may not substitute its judgment for that of the agency, but rather must confine its review to determining whether the agency's decision was arbitrary and capricious." *Eskridge Research Corp. v. United States,* 92 Fed.Cl. 88, 97 (2010) (citations omitted). "Accordingly, the test for reviewing courts is to determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Impresa,* 238 F.3d at 1332–33 (quotation omitted).

■ This deference applies to challenges to technical ratings. "The evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." *Beta Analytics Int'l, Inc. v. United States,* 67 Fed.Cl. 384, 395 (2005) (citing *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir. 1996)). This court has previously held that challenges regarding "'the minutiae of the procurement process in such matters as technical ratings ... involve discretionary determinations of procurement officials that a court will not second guess.'" *Beta Analytics,* 67 Fed.Cl. at 395 (quoting *E.W. Bliss,* 77 F.3d at 449); *see also Unisys Corp. v. United States,* 89 Fed.Cl. 126, 142 (2009) (holding that an agency's "exercise of such technical judgment and expertise .... is entitled to the greatest possible deference under *E.W. Bliss.*"); *Dismas Charities, Inc. v. United States,* 61 Fed.Cl. 191, 203 (2004) ("The decision as to whether an offeror should have scored a 3, 4, or 5 on any question is properly left to the discretion of the agency."). "Therefore, this court's main task is to ensure that the [agency] examined

the relevant data and articulated a 'rational connection between the facts found and the choice made.'" *WorldTravelService v. United States,* 49 Fed.Cl. 431, 441 (2001) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

■ Furthermore, a plaintiff in a bid protest action must demonstrate "significant prejudice," which requires that even if alleged errors were corrected "there was a 'substantial chance' it would have received the contract award but for the errors" in the agency's procurement. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1353 (Fed.Cir. 2005).

## III. DISCUSSION

ADS argues that the contract award to VF must be set aside for four reasons. First, ADS asserts that the Agency's past performance scores for ADS and VF cannot be reconciled with the Agency's scores for the other Factors/Functions in ADS's and VF's proposals and thus the decision is not rationally supported. Second, ADS contends that the Agency conducted a defective evaluation of ADS's proposal by failing to consider certain strengths in its proposal and irrationally reducing ADS's evaluation score based on non-existent weaknesses. Third, ADS asserts that the Agency's decision was arbitrary and capricious because the Agency applied the evaluation criteria unequally to VF and ADS. Finally, ADS argues that the Agency failed to follow the evaluation procedures set forth in the Appointment Letter. Each of these arguments will be addressed in turn.

### A. The Agency's past performance rating for ADS did not preclude the Agency from concluding that ADS's technical proposal was not adequate.

■ As discussed above, under the terms of the Solicitation, an offeror's past performance score comprised about one-third of the total technical score that an offeror could receive under the TEP's evaluation scheme. Past performance scores could range from −300 to +300. ADS received a perfect +300 points for its past performance. VF scored +200 points. ADS argues that, with a perfect past performance score, ADS's technical ratings should have been higher and that VF's should have been lower.

Specifically, ADS contends that with a perfect rating for past performance, the Agency's decision not to give ADS greater credit for "related experience" in its review of ADS's technical proposal was not rational. ADS asserts that "[g]iven that ADS was awarded a perfect score for its work on contracts similar in nature and complexity to the current contract, it is self-evident that ADS had substantial related experience for the performance of this Contract." Pl.'s Mot. at 21 (emphasis removed). Therefore, ADS contends, whenever the TEP "asserted that ADS lacked relevant experience for any given technical subfactor, it was making an internally inconsistent and contradictory determination that flew in the face of its past performance finding that ADS did have experience in work similar in nature and complexity." Pl.'s Resp. & Reply ("Pl.'s Reply") at 8. Applying this reasoning to VF's score, ADS argues that because of VF's lower past performance score of +200, VF should have received lower technical ratings. In ADS's view, ADS's perfect past performance score effectively precluded the Agency from finding ADS's technical proposal "marginal" whenever related experience was an evaluation factor, and also precluded the Agency from finding ADS's proposal only "good/satisfactory" rather than "outstanding" when related experience was an evaluation factor.

The government and VF argue that ADS mistakenly labels "past performance as dispositive of all technical ratings." Def.'s Cross–Mot. at 21; VF's Cross–Mot. at 19–21. The government and VF assert that, while "related experience" is included in the Agency's technical rating system, it is only one of several factors relevant to the evaluation of the other Factors. Def.'s Reply at 6; VF's Reply at 3–4. The government and VF further contend that Factors A through C primarily required the TEP to analyze each proposal to determine whether they provided an "outstanding approach" and "a high degree of confidence that the requirements in

the Statement of Work will be met efficiently and effectively." Def.'s Cross–Mot. at 22; *see* AR 2216. The government and VF also argue that the Agency was not required to weigh any of these scoring considerations in a certain manner.

After consideration of these arguments, the court agrees with the government and VF that the Agency's past performance scores do not irrationally conflict with the TEP's technical ratings of ADS's or VF's proposals. To evaluate whether the Agency's actions were irrational, the court must determine whether the Agency "provided a coherent and reasonable explanation of its exercise of discretion,'" *Impresa*, 238 F.3d at 1332–33, and must defer to the Agency's technical ratings unless there is no connection between the facts found and the choice made. *Beta Analytics*, 67 Fed.Cl. at 395.

The court finds that ADS's past performance rating did not preclude the Agency from finding ADS "marginal" in various technical areas, or "good/satisfactory" rather than "outstanding" in others. First, "related experience" was only one of several subfactors that the TEP used in evaluating the proposals. Factors A through C also required the TEP to analyze each proposal to determine whether they provided an "outstanding approach" and instilled "a high degree of confidence that the requirements in the Statement of Work will be met efficiently and effectively." The court agrees with the government and VF that this evaluation of "confidence" is a subjective determination on the part of the Agency to which the court must defer. The fact that ADS had "related experience" did not mean that the TEP could not find that there were material weaknesses in its proposal that affected its determination of confidence in ADS's ability to perform the requirements outlined in the Statement of Work. In addition, the degree of weight the TEP elected to give to "related experience" was left to the TEP's discretion. ADS did not receive a "zero" in any technical evaluation categories, indicating that the Agency reasonably evaluated ADS's related experience when determining ADS's technical score.

It is for these reasons, as well, that VF could score higher than ADS on its technical factor evaluation, even though it received a +200 instead of a +300 score on past performance. As the government asserted at oral argument, the subjective evaluation of "past *performance*" could be evaluated differently from the objective determination of "related *experience*." It is not unreasonable that VF, as the incumbent, would receive higher scores based on its objective related experience with the work in the Solicitation, although receiving a slightly lower, although still excellent score, in past performance. In sum, the role the TEP elected to give to "related experience" was a matter left to its discretion, and did not need to directly correlate with an offeror's "past performance" score.

As discussed in detail *infra*, the fundamental reason ADS received lower technical scores than VF was because its proposal was not tailored to the specific Statement of Work set forth in the Solicitation. The fact that ADS had done an excellent job on other uniform contracts did not mean that the TEP had to assume that ADS would do equally good work for DOI. The Solicitation made clear that the award would be based only on past performance considerations and on the offeror's technical proposal: "It is the Offerors' responsibility to ensure the completeness of the proposal. The evaluation panel for the Government will evaluate solely on the information provided in the proposal and will not assume that an Offeror possesses any capability unless specified in the proposal." AR 1020. Thus the TEP was not permitted, under the terms of the Solicitation, to give ADS more credit for past performance than authorized by the evaluation system. Where, as here, related experience was only one of several sub-factors the TEP had to consider in evaluating the technical proposals, and no specific weight was assigned to the sub-factor, the TEP had maximum discretion in determining how much credit related experience would play in the technical ratings. The court thus finds that ADS has failed to establish that it was entitled to receive any specific amount of credit in the technical evaluation for having "related experience," and that ADS's excellent past performance

rating did not preclude the TEP from giving ADS a "marginal" or "good/satisfactory" technical rating where it found ADS's proposal lacking.

## B. The Agency's reevaluation of ADS's proposal was not arbitrary and capricious.

■ ADS next argues that the Agency's evaluation of ADS's proposal was not rational because of errors in the TEP's and contracting officer's analysis of the strengths and weaknesses in ADS's proposal. ADS argues that if it were to have received good/satisfactory ratings for the Factors/Functions that were deemed marginal or a few outstanding ratings as opposed to good/satisfactory for certain other Factors/Functions it would have had enough points to have been considered in the best value determination. Each of ADS's arguments fails for the reasons discussed below.

### 1. Factor A: Technical Approach, Program Management and Quality Control and Experience

#### a. Function I: Project Management and Quality Control

First, ADS argues that the TEP's marginal rating of 25 points (out of 75 points) for Factor A, Function I—based on the TEP's conclusion that ADS's proposal failed to contain a detailed technical description—is "wholly unsupportable." Pl.'s Mot. at 24–25. ADS argues that in fact, its proposal described "multiple highly relevant projects the company currently performs for the U.S. Department of Defense and other Federal agencies," and that its score should not have been reduced given its "relevant experience." Pl.'s Mot. at 25. However, the court agrees with the government and VF that, as explained above, a high "past performance" score would not necessarily translate into any particular technical rating. ADS points to no evidence, other than its past performance score, to demonstrate that this score was irrational. To the contrary, the record demonstrates that the TEP reached its decision based on the lack of specific detail in ADS's proposal regarding the work identified in the Solicitation. *See* AR 2261 (one evalu-

ator's explanation that "this is a generic proposal written to address capability and experience in the defense supply industry" and that "[m]any specific items were not addressed or were glossed over"). While ADS may disagree with the Agency's evaluation, the court does not find this score unsupportable simply because ADS had done an excellent job in the past on other contracts involving other agencies.

#### b. Function II: Manufacture and Distribution of Uniforms

ADS next argues that for Factor A, Function II, the Agency overlooked several of ADS's strengths and found weaknesses that did not exist. The Agency found that ADS was good/satisfactory for this Factor/Function and awarded ADS 50 out of a possible 75 points. The missing strength ADS cites is, again, its experience working on other uniform supply contracts. As noted above, this experience was accounted for in the past performance rating and would not necessarily translate into higher technical ratings. In addition, the record shows that ADS received credit for its past experience in this Factor/Function—the TEP took into account ADS's strength as the * * * and gave ADS the second highest possible score in this category. AR 2214. ADS has therefore failed to demonstrate that the Agency's consideration of its related experience was arbitrary.

ADS also challenges the weaknesses identified by the Agency under this Factor/Function. As weaknesses, the Agency found that ADS failed to provide a detailed discussion regarding (1) sizes and the ability to meet non-standard sizes as required by Section C.6.1.3 of the Solicitation and (2) "accurately and professionally labeled swatch books" and revised uniform components and swatches as required by Section C.6.1.2 of the Solicitation. AR 895.

The court agrees with the government and VF that the scores ADS received on this Factor/Function are rational and supported. First, in asserting that its proposal did in fact address Section C.6.1.3 of the Solicitation, ADS relies on a portion of its proposal that, on its face, does not correspond with that Section. Pl.'s Mot. at 27–28 (citing AR

1140, ADS's proposal regarding C.6.1.2). While ADS argues that this organizational error should not affect the Agency's scoring on this Factor/Function, the court agrees with the government that the Agency was not required to consider other sections of ADS's proposal in its evaluation of any particular Factor or Function. *See IBM Corp. v. United States,* 101 Fed.Cl. 746, 758 (2011) (finding that an agency is "not required to search for additional information to assist [an offeror]"). The Solicitation expressly required the proposals to be "divided into the five major Contracting Functions (using separate and distinct sections), and then, within each Function, further divided to address Evaluation Factors A through C" and that "[o]n each page of the Technical Proposal, in the right hand margin, reference should be made to the corresponding Section C requirements." AR 1012. ADS has no basis to complain about the lower score it received when it admittedly deviated from the required proposal format.

Moreover, the court agrees with the government that the Agency's finding that ADS failed to discuss, in sufficient detail, Section C.6.1.2 of the Solicitation was rational and supported. ADS's proposal did not address all of the details required in this Section. *Compare* AR 894–95 (Solicitation requirements regarding provision of swatch books and revised uniform components), *with* AR 1139–40 (ADS's proposal describing * * *); *see* VF's Cross–Mot. at 17. ADS received 50 out of 75 points for this Factor/Function, the second highest possible score. Based on the record, the court finds that the Agency's scoring decision was rational.

### c. Function III: Centralized Uniform Allowance Control Database System

ADS received a marginal score of 25 out of 75 points for Factor A, Function III. ADS again argues that the Agency failed to take into account its relevant experience, and that the Agency erred in concluding that ADS's proposal had certain weaknesses for this Factor/Function.

The TEP listed four weaknesses in ADS's proposal for Factor A, Function III. First, the TEP found that special purchases were not addressed pursuant to Section C.7.3.7 of the Solicitation. Second, the TEP found that the individual employee ordering process was not addressed in enough detail, pursuant to Section C.7.3.1 of the Solicitation. Third, the TEP found that ADS did not address a system of ordering uniform purchases over the allotted uniform allowance under Sections C.7.4.1.1 and C.7.4.2 of the Solicitation. Finally, the TEP found that ADS did not address personal payment methods and/or processes under Section C.7.3.6 of the Solicitation. ADS argues that it adequately addressed these components of the Solicitation in its proposal, that it did so just as well as VF, and that, therefore, its marginal score of 25 points is not justified. Pl.'s Mot. at 29–33.

The government and VF argue again that "relevant experience" would not necessarily require a high technical score on this Function, and, for the reasons discussed above, the court agrees. As to the weaknesses, the government and VF contend that the weaknesses identified were legitimate and that therefore, ADS's marginal rating on this Factor/Function was appropriate.

The court again finds that the Agency decision is supported by the record, and therefore defers to the TEP's evaluation. While ADS may have generally addressed special purchases, individual employee ordering, purchases over the allotted uniform allowance, and payment processes in its proposal, the TEP evaluators concluded that ADS did not tailor its proposal to the Agency's unique needs or provide enough detail to justify a higher score. AR 2468. After a review of the proposals, the court finds that the Agency's conclusion was reasonable. *See Beta Analytics,* 67 Fed.Cl. at 395 (holding that challenges regarding " 'the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess' ") (quotation omitted).

In addition, the court agrees with the government and VF that ADS's reliance on scattered portions of its proposal to support its argument that it discussed special ordering and the individual ordering process is mis-

placed. *See* Def.'s Cross–Mot. at 26–28; Pl.'s Mot. at 30–33 (citing for support AR 1139 (describing * * * under Sections C.6.1.5 and C.6.1.7); AR 1142–46 (describing * * *); AR 1164 (stating that * * *); AR 1171 (generally describing * * *)). For example, in support of its argument that it addresses purchasing under Section C.7.3.6, ADS points to portions of its proposal addressing Function III, at issue here, but also addressing Function II and V. *See* Pl.'s Mot. at 33 (citing AR 1130, 1145, 1163, and 1171). Again, the Agency was not obligated to sift through ADS's proposal to see if the requirements for one Function were addressed elsewhere. *IBM Corp.*, 101 Fed.Cl. at 758. The fact remains that ADS did not follow the organizational requirements in the Solicitation. AR 1012. The court therefore finds the Agency's decision supported in the record and defers to the Agency's scoring for this Factor/Function.

#### d. Function IV: Uniform Inventory and Control System

ADS also takes issue with the TEP's evaluation of its proposal under Factor A, Function IV, arguing that the Agency failed to take into account several strengths and inappropriately found several weaknesses in its proposal. ADS received a marginal score of 25 out of 75 possible points for this Factor/Function. Specifically, ADS argues that the Agency failed to account for its * * *, in evaluating its proposal under this particular Factor/Function.

ADS also argues that the Agency's listed weaknesses for this Factor/Function have no basis. The Agency listed three weaknesses for ADS's proposal: (1) the proposal did not address how items would be shipped to the government under Solicitation Section C.7.3.3, (2) the proposal did not address expedited shipping under Section C.7.3.3.1, and (3) the proposal did not address handling of returns under C.7.3.1.[1] AR 2468. ADS argues that its proposal addresses all of these

issues. In particular, ADS contends that it addressed delivery in its proposal by stating that * * *. AR 1164. ADS further argues that its description of the delivery process was sufficient to address expedited shipping. Pl.'s Mot. at 35 (citing AR 1164). As to the handling of returns, ADS argues that its description of its customer support structure sufficiently addressed returns, pointing to several portions of its proposal. ADS further contends that its description of its delivery capabilities were just as detailed as the other proposals.

The government and VF argue that ADS's low technical score is justified by the fact that ADS gave only a generic description of delivery and returns in its proposal and did not explain how it would work in the context of this particular Solicitation. The government and VF point to the TEP's evaluations, one of which states that ADS's proposal provided an "insufficient discussion on how the generic inventory description would apply to DOI's contract." Def.'s Cross–Mot. at 29 (quoting AR 2264 (one TEP reviewer's evaluation of ADS's proposal)). Therefore, the government and VF conclude, the TEP's list of weaknesses and ADS's resulting low score were not arbitrary. The court agrees.

The record demonstrates that the TEP's decision was not arbitrary. In fact, the sections of ADS's proposal that plaintiff relies on do not specifically address the requirements of Sections C.7.3.3, C.7.3.3.1, or C.7.3.1. For example, in its discussion of delivery, ADS's proposal states that * * *, but does not mention * * *. AR 903. In response to handling of returns under Section C.7.3.1, ADS references its response to Section C.9.1 of the Solicitation.

A review of the proposals also demonstrates that the TEP's decision, reflected in the scoring, that VF's proposal contained more detail than ADS's proposal was rational.[2] The record provides a basis for ADS's

---

**1.** The Agency subsequently noted that these weaknesses should have been included in Factor A, Function III, but that this error would not change ADS's score. AR 2211.

**2.** For example, ADS argues that its proposal in regard to Sections C.7.3.3 (order fulfillment and shipping) is just as substantive as VF's proposal.

Pl.'s Reply at 16–17. This Section required offerors to "ship orders or exchanges no later than 5 business days after receipt. Ensure order is delivered to recipient no later than 10 business days after shipping." AR 903 (C.7.3.3). ADS cites several sections of its proposal where it

score, and the thus court defers to the TEP's judgment on this Factor/Function.

### e. Function V: Customer Service, Research, and Special Needs

ADS further argues that the Agency's scoring of 50 out of 75 total points for Factor A, Function V is irrational, because the Agency failed to account for ADS's additional strengths in this area, including ADS's work on similar design projects. The government and VF argue again that ADS's "relevant experience" did not necessarily require a higher technical score on this Function, and, for the same reasons as those discussed above, the court agrees.

ADS also contends that the Agency's listed weakness—that ADS did not address wear testing or how ADS would work with the Agency to conduct testing on new or revised components under Section C.9.2.2 of the Solicitation—"is wrong." Pl.'s Mot. at 38. ADS argues that it specifically addressed this Section in its proposal by describing its * * *. AR 1173 (cited in Pl.'s Mot. at 39). The government and VF again point to the generic nature of ADS's proposal and the fact that ADS failed to explain how its proposal would apply to DOI's sub-agencies. Def.'s Cross–Mot. at 29–30. After a review of the proposals and evaluations, the court finds that ADS has not met its burden with regard to the TEP's judgment on this score as well. ADS's cited proposal section may describe but does not expressly mention "wear testing" or the electronic reporting requirement found in Solicitation Section C.9.2.2. Given this lack of detail, the court does not find that the Agency's decision to give ADS a "good/satisfactory" score on this Factor/Function lacked a rational basis.

### f. Reevaluation Score Change

Finally, ADS argues that for Factor A overall, the Agency awarded ADS 175 points upon reevaluation of ADS's proposal, which is 25 points less than what ADS was initially awarded in the first round of evaluations. ADS argues that the Agency provides no legitimate rationale as to why this score was reduced upon reevaluation, and that the score change "demonstrates the vagueness and uncertainty surrounding the Evaluation Factors in this procurement, and the capriciously random manner in which these Factors have been applied by the Agency." Pl.'s Mot. at 24.

Based on the discussion above, however, the court finds that ADS's lower score was justified by explanations in the record and was not arbitrary or capricious. The court agrees with the government and VF that changes in the scores upon reevaluation were to be expected in light of the Agency's decision to correct previous evaluation errors after ADS's initial GAO protest. *See Vanguard Recovery Assistance v. United States,* 101 Fed.Cl. 765, 786 (2011) (rejecting a challenge to a change in agency scoring from initial evaluation to reevaluation, stating that "an agency has the right to change its mind in the course of an evaluation if it has good reason") (citations omitted); *Fort Carson Support Servs. v. United States,* 71 Fed.Cl. 571, 604 (2006) ("[I]t is certainly the [agency]'s prerogative to change its mind—its failure to identify an existing weakness in a proposal does not preclude the [agency] from considering the weakness later."); *Dismas,* 61 Fed.Cl. at 202 ("The mere fact that the rescoring resulted in [plaintiff's] score going down—a disparate *result*—does not mean that [plaintiff] was treated unfairly or differently."). The Agency was not bound by ADS's original scores and could raise or lower ADS's scores on any Factor if the reevaluation supported a different conclusion.[3]

addresses shipping to argue that it was improperly given a low score:

    * * *. [AR 1116 (describing personnel) ] . . .
    * * *. [AR 1164 (discussing delivery) ] . . .

*See* Pl.'s Reply at 16–17.
VF's proposal, in contrast, states that:
    * * *

AR 1409. The court does not find it unreasonable that ADS would have received a lower score than VF based on VF's detailed response to the Solicitation's requirements, as opposed to the scattered sections of ADS's proposal. Through-

out its proposal, ADS failed to tailor its submission to the Solicitation's details leaving the Agency with the not unreasonable perception that ADS had not fully thought through how it would meet DOI's specific needs which the Agency perceived were different from that of ADS's other agency contracts.

**3.** ADS is not complaining that on balance, its score was raised by more than 200 points upon reevaluation.

Thus, the court finds that the Agency's conclusion that ADS failed to address many Solicitation areas in any relevant detail for Factor A is supported and that ADS's reevaluation score was therefore rational.

## 2. Factor B: Personnel/Management Capability

### a. Function I: Project Management and Quality Control

ADS next argues that the Agency's evaluation of its proposal under this Factor/Function was irrational because the weakness listed by the Agency was, in fact, addressed in ADS's proposal. ADS received a "good/satisfactory" score of 50 points for this Factor/Function, the second highest possible score. The Agency identified as a strength the fact that ADS's proposal identified its project managers and listed "good capabilities and experience." AR 2469. As a weakness, the Agency found that ADS failed to indicate the "amount of dedication" to the contract as required by Solicitation Section C.5.2, which states: "Provide a minimum of two Project Managers who will be responsible and dedicated to the individual agency programs." AR 892.

While ADS agrees that it did not specifically * * *, ADS argues that it met this criterion by generally describing its * * *. Pl.'s Mot. at 40 (citing AR 1120, discussing * * *). This section does not, however, specifically address whether and how its project managers would be dedicated to the individual Agency programs, but instead provides generic descriptions like * * *. AR 1120. For the same reasons as discussed above for Factor A, the court finds that the Agency's decision is justified in the record and does not lack a rational basis. Again, the TEP's general complaint revolved around ADS's failure to tailor its capabilities to the Solicitation's requirements and its concern that merely folding the subject work into ADS's other military-related work would leave DOI without adequate support. *See* AR 2467–70 (summary of ADS's technical ratings). The court finds the TEP's conclusion supportable as to this Factor/Function, and finds no basis for setting aside this score.

### b. Function II: Manufacture and Distribution of Uniforms

ADS next argues that the Agency's evaluation of its proposal under this Factor/Function is arbitrary because the Agency listed no strengths and listed the following weakness: ADS "[d]id not present a comprehensive and detailed proposal, specific to [the Solicitation] requirements, that will ensure proper and efficient management of the contract as specified in Section C." AR 2469. ADS received a score of 50 out of 75 points for this Factor/Function.

The government and VF argue that this score was again due to ADS's generic descriptions of its personnel's abilities as demonstrated in its military supply contracts. AR 1507. The court agrees with the government and VF that nothing in the record supports ADS's conclusion that this relatively high score lacks a rational basis. A review of the TEP panel's individual reports confirms that all TEP reviewers found this flaw in ADS's proposal. *See* AR 2235, 2251, 2267, 2284, 2300. Given the deference owed to the TEP, ADS has failed to demonstrate a reason to set aside the subject score.

### c. Function III: Centralized Uniform Allowance Control Database System

The TEP also gave ADS a score of 50 for Factor B, Function III. The TEP's summary evaluation report indicated that "no strengths or weaknesses" were noted. AR 2469. ADS argues that the TEP's score of 50 for this Factor/Function, where no strengths or weaknesses were noted, is inconsistent with the TEP's other scores of 50 points, where both strengths and weaknesses are noted. These inconsistencies, ADS concludes, reveal the arbitrariness of the Agency's scoring system "based upon no legitimate criteria." Pl.'s Mot. at 41.

The government and VF argue that while the consensus report did not address the strengths and weaknesses of ADS's proposal regarding this Factor/Function, the TEP's individual reviews outlined certain weaknesses, which "is sufficient documentation of the TEP's reasoning to warrant a good/satisfactory rating." Def.'s Cross–Mot. at 31 (citing AR 2269, 2301). These individual reviewer

comments focused on the lack of specifics as to ADS's production manager and team, AR 2269, and IT contact and help desk personnel, AR 2301. ADS argues in response that these purported weaknesses are not valid because the Solicitation required only that offerors "[d]escribe the personnel, staffing plans, and resources assigned for [the Centralized Uniform Allowance Control Database System]." AR 1014.

Contrary to ADS's assertion, the court finds that the individual reviewers' evaluations, which include both strengths and weaknesses, provide sufficient documentation in the record to justify ADS's score. In reviewing the Agency's decision, the court need only determine whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1333 (quotation and citation omitted). The court finds that the individual reviewers' scores regarding personnel provide this reasonable explanation. The court does not find merit in ADS's argument that the review process itself was illegitimate because ADS received the same score in other Factors/Functions for which the consensus report mentioned strengths and weaknesses. As mentioned previously, the court will not delve into the minutiae of the Agency's procurement process by distinguishing between strengths and weaknesses in the consensus report and in individual evaluations. *See Beta Analytics*, 67 Fed.Cl. at 395. Having documented the strengths and weaknesses for this Factor/Function in the individual evaluations, the Agency has provided sufficient justification to receive the deference afforded to technical scoring.

#### d. Function IV: Uniform Inventory and Control System

Regarding this Factor/Function, the Agency initially, upon reevaluation, awarded ADS a marginal score of 25 out of 75 points. The TEP listed no strengths for ADS's proposal, but found two weaknesses based on Sections C.8.1 and C.8.2 of the Solicitation. Section C.8.1 requires an offeror to "[p]repare, implement and maintain a plan for providing security for Agency patches and badges" and Section C.8.2 requires an offeror to "[p]repare, implement, and maintain a plan for

secure storage of all first article samples submitted under the contract." AR 917. The TEP found that (1) ADS did not provide details for securing uniform patches under Section C.8.1 and (2) ADS did not provide details on the security of the first article samples under C.8.2.

The Agency subsequently determined that the second weakness should have been accounted for in another factor, and increased ADS's score in this Factor/Function to 50 out of 75 points. AR 2211. The government and VF argue that this score is justified because ADS failed to identify the personnel and staff who would be responsible for this particular Function.

ADS argues that it adequately addressed both weaknesses in its proposal by indicating that it * * *, AR 1169, and that it * * *. AR 1139. ADS also argues that it was not required under the Solicitation to specifically identify staff and personnel for this Function.

The court again agrees with the government and VF that the individual reviews form a basis in the record to justify ADS's score. This Factor is labeled "Personnel/Management Capability" in the Solicitation, to be measured "in accordance with all [Solicitation] functions," including this Function. AR 1023. Accordingly, the individual reviewers found that ADS's proposal should not receive a perfect score because ADS did not identify the individuals who would be responsible for this Function, leaving the TEP without details to evaluate ADS's capabilities. *See* AR 2253, 2269, 2302 (individual reviewers' evaluations). The court finds this documentation sufficient to justify the TEP's decision to grant ADS a relatively high score of 50 out of 75 points for Factor B, Function IV.

#### e. Function V: Customer Service, Research, and Special Needs

In connection with Factor B, Function V, the Agency awarded ADS 50 out of 75 points. For this Factor/Function, the Agency listed a weakness in ADS's proposal as failing to comply with Section C.9.1 because of the lack of detail ADS provided regarding the size or commitment of ADS's customer service team. AR 2469, 2222. ADS again argues that the

Agency is wrong, because ADS's proposal * * *. AR 1170. The government and VF argue that ADS's score of 50 points is justified because ADS did not "explain the size or commitment of the proposed customer service team or how that team would handle contacts with all five DOI sub-agencies." Def.'s Cross–Mot. at 32; VF's Reply at 12. The court finds this rationale reasonable. While ADS included points of contact in its proposal, ADS's proposal did not provide detail as to the full size of its customer support team or how this team would be divided to meet the needs of DOI's five sub-agencies. The court thus finds that the Agency's decision to reduce ADS's score by 25 points has a basis in the record and will not be set aside as irrational.

### 3. Factor C: Contract Phase– In and Phase–Out Plans

ADS received 10 out of 30 possible points for each contracting Function for Factor C—resulting in a total score of 50 out of 150 points for this Factor—because ADS failed to provide any contract phase-out plan. ADS does not contest that it did not include a phase-out plan in its proposal. Rather, ADS argues that its reevaluation score must be arbitrary because it is lower than the score it received during the initial evaluation. Pl.'s Mot. at 45. However, as discussed above, the court agrees with the government and VF that changes in the scores upon reevaluation were to be expected and are not arbitrary simply because the scores were lowered. *See* Part III.B.1.f, *supra.* Moreover, the fact that ADS's proposal did not include a phase-out plan provided a sufficient basis for lowering the scores. The court agrees with the government and VF that ADS has failed to show that the TEP's decision to lower its rating was not rational or supported.

### 4. Factor D: Uniform Samples

Finally, ADS received a score of 75 out of a possible 150 points for this Factor. For Factor D, the Solicitation required offerors to supply "like items" samples for evaluation. AR 1015. The Solicitation further provided that the samples would be evaluated "based on design, quality, material, and workmanship in the context of the contract specifications." AR 1024. The TEP rating system called for a score of 75 points if "[o]ne or more samples did not meet contract specifications." AR 2228. The Agency reduced ADS's score in this Factor because it found that ADS provided nine samples that did not comply with the Agency's specifications, including items that were made in the wrong style and fabric. AR 2288.

ADS argues that the terms of the Solicitation only required it to provide "similar" items, rather than "identical" samples. Pl.'s Mot. at 46. ADS contends that it was impossible for ADS to provide identical samples because it did not have enough detail about production specifications for the requested items. *Id.* at 47. ADS also argues that the items listed by the Agency as failing to meet specifications involved problems that could have been easily fixed if the Agency had only asked.

The government and VF argue that the TEP's decision as to this Factor is entitled to deference and should not be set aside as arbitrary or capricious, because, at the very least, one of the samples did not meet contract specifications. Specifically, the government and VF point to Specification C300 in the Solicitation, entitled "straw hat." AR 64. The specification explained that the hat's "material shall be Bedform hemp braid, tight weave and vented Mylar braid Belgium belly tan." *Id.* ADS, however, provided a * * * hat. AR 2228.

The court agrees with the government that ADS's score as to this Factor was justified. Regardless of whether other specifications in the Solicitation were "vague," as ADS contends,[4] ADS did not provide a "straw" hat,

---

4. The court finds this assertion dubious, as the specification comprises hundreds of pages of the administrative record. Moreover, in support of this argument, ADS points to an email between ADS and the Agency in which ADS requested more detail as to the Solicitation's specifications. In response, the Agency advised that ADS should submit its "best effort proposal" and issued an amendment to the Solicitation clarifying the specifications. The government asserts that ADS's argument based on "ambiguities" in the specifications should be rejected, because the terms of the Solicitation, not the terms of the email exchange, controls, and because ADS waived any claim of ambiguity because it did not raise that issue before the contract award. Def.'s

but instead provided a * * * hat that deviated from the express material specification listed in the Solicitation. Under the terms of the Solicitation and the TEP's rating system, which called for a score of 75 points if "[o]ne or more samples did not meet contract specifications," AR 2228, ADS reasonably received a score of 75 points for this Factor/Function. Based on the record, the court finds that the Agency's rating decision was justified.

In sum, the record in this case demonstrates that the Agency's technical reevaluation of ADS's proposal was conducted in accordance with the terms of the Solicitation and that its scores were rational and supported. ADS was not asked to meet an unreasonable technical threshold under the terms of the Solicitation—a score of 950 out of 1350 meant that ADS could lose 400 points (about thirty percent of the maximum amount of points possible) and still be rated technically acceptable. Rather than demonstrating that the Agency's conduct was arbitrary, ADS's arguments amount to mere disagreements with the Agency's conclusions, which are insufficient for this court to overturn VF's contract award. *See Bannum, Inc. v. United States,* 91 Fed.Cl. 160, 173 (2009) ("[The plaintiff's] mere disagreement with the [agency's] . . . rating is not sufficient for this Court to overturn it."). As stated above, it is not for this court to substitute its own judgment for that of procurement officials, as ADS asks it to do in this case. *See Unisys,* 89 Fed.Cl. at 142. The technical evaluation process required the TEP to exercise its technical judgment and expertise, and the record demonstrates that it did so. Accordingly, the TEP evaluation is entitled to deference.

### C. The evidence in the administrative record does not show that the Agency applied the evaluation criteria unequally.

ADS next argues that this court should set aside the contract award because the TEP did not conduct a thorough evaluation of VF's proposal and failed to apply the evalua-

tion criteria equally to VF and ADS. In support, ADS attacks the Agency's reevaluation of VF's proposal. ADS argues that the TEP's reevaluation consensus report for VF, as well as certain individual VF evaluations, contain no discussion of weaknesses, and that several VF weaknesses found in the original evaluations were not mentioned or discussed during the reevaluation. ADS generally argues that this lack of documentation and the disappearing weaknesses demonstrate the arbitrary nature of the Agency's decision-making process.

Specifically, ADS argues, for example, that VF improperly received a 25–point increase for Factor B, Function IV upon reevaluation. ADS asserts that the following weakness found in the original consensus evaluation report disappeared from the reevaluation consensus report: "Duties and responsibilities of personnel assigned to this area is not discussed." AR 1802. ADS also argues that certain individual evaluations failed to mention weaknesses that were originally mentioned in the initial evaluation's individual reviews. For example, one reviewer mentioned in her initial evaluation that VF's database system would sometimes go down, and she therefore awarded VF 50 points for Factor A, Function III. AR 1859. However, that reviewer failed to mention this weakness upon reevaluation, and the consensus report assigned VF 75 points for this Factor/Function. AR 2427, 2379. ADS also contends that other reviewers did not provide enough discussion in their reevaluation reports. ADS argues that the sparse discussion or elimination of weaknesses "illustrate the fundamental irrationality of the evaluations." Pl.'s Mot. at 52.

The government and VF argue in response that VF's score is justified based on its strong and detail-oriented proposal, as opposed to ADS's generic proposal that failed to address all of the contract requirements. The government and VF further argue that the Agency did address VF's weakness—its past performance—by noting in the TEP's reevaluation memo to the contracting officer

Mot. at 34 n. 8 (citing *Blue & Gold Fleet, LP v. United States,* 492 F.3d 1308, 1313 (Fed.Cir. 2007)). Because the court finds that the Agen-

cy's score is justified in the record, the court declines to address this argument.

that VF received +200 out of a possible +300 points "due to our experience with them during the previous contract period." AR 2130. The government and VF also argue that the change between the initial evaluation and the reevaluation is not remarkable, since the Agency's "consensus report required the melding of five separate opinions [and] ... any changes in the TEP's individual evaluations could be reasonably expected, especially because DOI took corrective action to correct the flaws in the first round of evaluations." Def.'s Cross–Mot. at 35–36.

After a review of VF's and ADS's proposals and the reevaluations of each, the court agrees with the government and VF that ADS has failed to carry its heavy burden of demonstrating that VF's and ADS's proposals were treated unequally and that the contract award to VF was irrational. First, as discussed in more detail above, the court agrees with the government that changes in opinion between the initial evaluation and the reevaluation, and between the individual reviews and the consensus, are not unusual and do not indicate any "illegitimate" action on the part of the Agency. *See Vanguard,* 101 Fed.Cl. at 786 (rejecting a challenge to a change in agency scoring from initial evaluation to reevaluation, stating that "an agency has the right to change its mind in the course of an evaluation if it has good reason") (citations omitted). The fact that VF's scores changed upon reevaluation does not mean that ADS and VF were treated differently. *See Dismas,* 61 Fed.Cl. at 202 ("The mere fact that the re-scoring resulted in [plaintiff's] score going down—a disparate *result*— does not mean that [plaintiff] was treated unfairly or differently."). In fact, both ADS's and VF's total scores changed upon reevaluation, and both for the better. ADS's score was raised from 645 to 850 points.

In addition, the court finds that there is evidence in the record, based on VF's proposal and the TEP's documentation of the strengths of VF's proposal, to justify VF's high scores as compared to ADS's lower scores.[5] As discussed at length above, there is also evidence in the record to support the Agency's general argument that ADS received a low score due to the generic nature of its bid. *See* Part III.B, *supra.* There is no indication in the record that the TEP used different standards when reevaluating ADS's and VF's proposals. The Agency's decision to reevaluate the proposals after ADS's first GAO protest "was the result of a considered process, and therefore, was not arbitrary and capricious," *Dismas,* 61 Fed.Cl. at 203, and the re-scoring itself is part of the "minutiae" of the contracting process, which the court will not second guess. *Beta Analytics,* 67 Fed.Cl. at 395; *see also Structural Associates, Inc./Comfort Sys. USA (Syracuse) Joint Venture,* 89 Fed.Cl. 735, 748 (2009) (rejecting a challenge to a technical evaluation because "[w]hether or not ... [contractor] experience adequately addresses the ... [Solicitation] criterion, however, is a matter over which this court has no expertise. Under such circumstances, we have no choice but to defer to the judgment of [the agency] who concluded that [the contractor] satisfied all four of the [Solicitation] criteria. In the absence of a showing that this determination is inherently unreasonable, the agency's judgment must be allowed to stand.").

Moreover, as further addressed in Part III.D, *infra,* to the extent that ADS is arguing for relief based on the Agency's failure to follow the TEP Appointment Letter in conducting its evaluations—for example, based on its assertion that an individual reviewer failed to sufficiently document her evaluation decision pursuant to the Appointment Letter—that argument lacks merit. *Allied*

---

5. VF received consistent high marks based on its proposal's detail and indicators of "efficient management." AR 2377. The court finds that VF's high score, as compared to ADS's lower score, is justified in the record. To take one example, ADS argues that its proposal with regard to specialty items is "almost identical" to VF's proposal. Pl.'s Reply at 13. ADS's proposal states that * * *. AR 1139. The TEP found this section lacking substantive detail as to what

ADS agreed to do if it was awarded the contract in regard to specialty items. AR 2215(* * *). VF's proposal, in contrast, states that it:
   * * *
AR 1400. After a review of the proposals, for this and other areas of the Solicitation, the court finds that the Agency supplied a sufficient basis to conclude that VF's proposal was superior. *See* VF's Reply at 7–10 (comparing VF's and ADS's proposal).

*Tech. Grp., Inc. v. United States,* 94 Fed.Cl. 16, 41 (2010) (finding that internal agency documents provide no rights to offerors). The court therefore holds that ADS has not met its heavy burden of demonstrating that the Agency's evaluation of VF, as compared to ADS, was inherently unreasonable, and defers to the Agency's award decision.

### D. ADS may not rely on the evaluation procedures set forth in the TEP Appointment Letter to argue that the award decision was irrational.

■ Finally, ADS seeks relief based upon allegations that the TEP failed to follow the exact procedures that the contracting officer established in the TEP Appointment Letter. Pl.'s Mot. at 52–53. The Appointment Letter stated that the TEP must support its finding of technical unacceptability with "concrete technical data" and must provide an explanation as to whether a proposal could be made acceptable through discussions. AR 1483–84. The Appointment Letter also required the TEP to document its findings. *Id.* ADS argues that the TEP did not follow these requirements because they did not support their finding of technical unacceptability with concrete technical data, did not provide an explanation as to why ADS's proposal could not be made acceptable through discussions, and did not sufficiently acknowledge or document the strengths of ADS's proposal and the weaknesses of VF's proposal. Pl.'s Mot. at 52–53. Therefore, ADS contends, the award decision based on the TEP's improper evaluation lacked a rational basis.

The government and VF argue that the Solicitation, not the Appointment Letter, must control this court's decision. The government and VF contend that internal, non-public agency guidelines do not give private parties any rights in challenging an award. The government and VF further argue that the Solicitation itself does not contain any of the procedural requirements of which ADS complains. Therefore, the government and VF assert, the court should not set aside the contract award to VF. The court agrees.

■ It is well settled that source selection plans and other guidelines do not give any rights to offerors. *Allied Tech. Grp.,* 94

Fed.Cl. at 41 (rejecting a challenge based on the failure of a review panel to document issues of noncompliance prior to issuing a source selection decision, and holding that "[t]his Court consistently has held that source selection plans and other internal documents are guidelines that do not give any rights to offerors"). The reasoning behind this established rule is that internal, non-public agency guidelines do not give private parties any rights in challenging an award; rather, the agency's solicitation controls. *ManTech Telecom. & Info. Sys. Corp. v. United States,* 49 Fed.Cl. 57, 67 (2001) (holding that the solicitation controls if there are conflicting requirements between the source selection plan and the solicitation); *Manson Constr. Co. v. United States,* 79 Fed.Cl. 16, 19 (2007) (holding that an internal document outlining the make-up of the review panel was not a legitimate basis for a protester's challenge).

ADS argues that the above-cited cases—in which the protestor asserted that an evaluation factor or criteria presented in the internal agency document changed, contradicted, or added requirements to the Solicitation itself—are distinguishable from the present situation. Here, ADS argues, the Appointment Letter did not change the Solicitation's requirements, but outlined the procedures that the Agency needed to follow when making the contract award. ADS contends that the court may therefore look to the Appointment Letter to "clarify[ ] the circumstances affecting" the subject contract. Pl.'s Reply at 3–4 (citing *KMS Fusion Inc. v. United States,* 36 Fed.Cl. 68, 81–82 (1996) and *Applied Cos. v. United States,* 37 Fed.Cl. 749, 759 (1997)).

The court does not find ADS's argument persuasive. To begin, the protestor in *Allied Technology Group, Inc. v. United States,* one of the cases ADS attempts to distinguish, did challenge the review panel's failure to follow internal agency document procedures in preparing its technical evaluation reports, and the court in that case rejected an argument similar to the one ADS now asserts:

[The plaintiff] also takes issue with the TEP's failure to create a consensus report as required in the [proposal evaluation

plan].... The [proposal evaluation plan] was an internal government document outlining the source selection process.... As previously discussed, source selection plans and other internal agency documents are guidelines that do not give any rights to offerors.

94 Fed.Cl. at 47 (citing *Manson,* 79 Fed.Cl. at 19). Nor does ADS provide a convincing rationale as to why the court should treat procedures in a source selection plan that outline how a technical panel will be comprised, *see Manson,* 79 Fed.Cl. at 19, or how that panel will conduct an evaluation, *see ManTech,* 49 Fed.Cl. at 67, differently from the procedures in the Appointment Letter.

In addition, the cases ADS cites in support of its argument are inapposite. These cases do not arise in the bid protest context, and address the interpretation of ambiguous contract provisions. *KMS Fusion,* 36 Fed.Cl. at 68 (addressing a breach of contract argument based on the interpretation of preamble clauses); *Applied Cos.,* 37 Fed.Cl. at 751 (addressing a breach of settlement agreement); *see also Glenn Def. Marine (Asia) PTE, Ltd. v. United States,* 97 Fed.Cl. 311, 322 n. 13 (2011) (acknowledging that the court may use extrinsic documents for the purposes of interpreting ambiguous contract terms but stating that "[i]nternal agency documents ... of course, do not by themselves establish legally-enforceable rights."), *appeal dismissed as moot by* 469 Fed.Appx. 865 (Fed.Cir.2012). The court therefore agrees with the government and VF that the Appointment Letter has no bearing on the court's evaluation of the Agency's contract award. *See Allied Tech. Grp.,* 94 Fed.Cl. at 47. Any shortcoming in the Agency's process based on the Appointment Letter's guidelines are irrelevant unless those requirements were also contained in the Solicitation.

The Solicitation does not set forth any of the requirements upon which ADS relies to argue that the contract award was arbitrary. Under "Evaluation Procedures," the Solicitation states only that the TEP "will provide a written summary of the evaluation results to the Contracting Officer." AR 1021. This is precisely what the administrative record reflects—the TEP provided a written summary of its technical ratings in both rounds of evaluations. *See* AR 1886–1892; AR 2457–2464. As explained above in detail, the TEP provided a basis for each rating that ADS received by identifying the numerous areas in which ADS's proposal was either generic or non-responsive to the Solicitation's requirements, and providing a corresponding technical score. The court finds that the Agency has complied with the terms of the Solicitation in conducting its evaluations.

█ Finally, ADS's challenge to the Agency's decision not to conduct discussions is without merit. Pl.'s Mot. at 53; *see, e.g.,* Pl.'s Reply at 18. The Solicitation unequivocally reserved the Agency's right not to conduct discussions. AR 1021 ("The Government reserves the right ... to award a contract based on initial offers received without discussion of such offers."). This reservation can also be found in the source selection statement. AR 2522 ("The Government intends to evaluate proposals and reserves the right to award a contract without discussions with offerors."). ADS was therefore on notice, based on the clear terms of the Solicitation, that corrective discussions were not guaranteed, and that its proposal would either stand or fall on its own, as written.[6]

Furthermore, apart from the express language of the Solicitation, this court has recognized that "both the decision to conduct discussions and the scope of any discussions are left to the judgment of the contracting officer." *Biospherics, Inc. v. United States,* 48 Fed.Cl. 1, 9 (2000); *see also Orion Tech., Inc. v. United States,* 102 Fed.Cl. 218, 232 (2011) (citations omitted); *Data Monitor*

---

6. At oral argument, plaintiff suggested that discussions were necessary in this case because the procurement process devolved into "a sole source procurement" after ADS was eliminated during the technical stage of the evaluation and after * * * was eliminated during the price evaluation. The court finds that there is no evidence to support that concern, where two out of the three proposals were determined to be technically acceptable and were then evaluated according to price. There is no basis for the court to find that adherence with the express terms of the Solicitation somehow led to an unsound procurement result.

*Sys., Inc. v. United States,* 74 Fed.Cl. 66, 73 (2006) (holding that an "agency has wide discretion with respect to the manner in which it conducts it procurements, including the decision whether to conduct discussions"). Therefore, it was well within the contracting officer's discretion to choose not to conduct discussions with ADS in order to make its proposal technically acceptable.

Accordingly, the court will not set aside the contract award to VF based on ADS's arguments regarding the Appointment Letter or on the Agency's decision not to conduct discussions with ADS to address the TEP's issues with ADS's proposal.

## IV. CONCLUSION

For the forgoing reasons,[7] plaintiff's motion for judgment on the administrative record is **DENIED,** and the government's and VF's cross-motions are **GRANTED.** Each party shall bear its own costs. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

---

7. Because the court finds that the Agency's actions were not arbitrary and capricious, the court does not reach the government's arguments regarding ADS's failure to show prejudice.

